IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

TIMOTHY REESE,
      Petitioner,

vs.                       Case No.:  5:16cv10/WTH/EMT

JULIE L. JONES,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's second amended petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 (ECF No. 20).  Respondent filed an answer and relevant portions of the state court record (ECF Nos. 32, 34).  Petitioner filed a reply (ECF No. 39).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show

that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 34).[1]  Petitioner was charged in the Circuit

Court in and for Bay County, Florida, Case No. 2005-CF-3362, with one count of

arson of a dwelling and one count of felony animal cruelty (Ex. A at 112).  Following

a jury trial on April 24–25, 2007, he was found guilty as charged (Ex. A at 129, Exs.

B, C, D).  At the conclusion of trial, Petitioner was sentenced to a term of twenty (20)

years in prison on the arson count and a concurrent term of five (5) years in prison on

the animal cruelty count, with jail credit of 24 days (Ex. A at 134–40, Ex. S).

Petitioner filed a motion to correct sentencing error, pursuant to Rule 3.800(b)(2) of

the Florida Rules of Criminal Procedure (Ex. T at 1–3).  The state circuit court

summarily denied the motion (*id.* at 61).

Petitioner, through counsel, appealed the judgment to the Florida First District

Court of Appeal ("First DCA"), Case No. 1D07-4029 (Ex. U).  The First DCA

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted by Respondent (ECF No. 34).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

affirmed the judgment per curiam without written opinion on March 30, 2009, with the mandate issuing April 15, 2009 (Ex. W).  Reese v. State, 6 So. 3d 59 (Fla. 1st DCA 2009) (Table).

On April 13, 2010, Petitioner, through counsel, filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. Y at 244–55).  The state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion within thirty (30) days (id. at 268).  Petitioner filed a timely amendment (id. at 269–73).  The circuit court again struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion within thirty (30) days (id. at 279–80).  Petitioner filed a second amended motion (id. at 296–309).  The State filed a response (id. at 315–20).  The court granted a limited evidentiary hearing (Ex. Y at 377–78, Ex. AA).  Following the hearing, the state circuit court denied the second amended Rule 3.850 motion (Ex. Z at 396–406).  Petitioner appealed the decision to the First DCA, Case No. 1D13-5931 (Ex. BB).  The First DCA affirmed per curiam without written opinion on December 12, 2014, with the mandate issuing February 16, 2015 (Exs. EE, GG).  Reese v. State, 156 So. 3d 1083 (Fla. 1st DCA 2014) (Table).

On February 24, 2014, Petitioner filed a second Rule 3.850 motion based upon "newly discovered evidence and fraud practiced on court" (Ex. HH at 1–20). The state circuit court dismissed the motion for lack of jurisdiction on March 10, 2014 (*id.* at 83–84). Petitioner appealed the decision to the First DCA, Case No. 1D14-2135 (*id.* at 94). The First DCA affirmed per curiam without written opinion on December 12, 2014, with the mandate issuing January 7, 2015 (Ex. II). Reese v. State, 152 So. 3d 571 (Fla. 1st DCA 2014) (Table).

On March 10, 2015, Petitioner filed a successive Rule 3.850 motion based upon "newly discovered evidence" and "fraud" (Ex. JJ at 1–17). The state circuit court dismissed the motion as untimely and successive (Ex. KK at 249–52). Petitioner, through counsel, filed a "Motion to Reconsider" (*id.* at 288–91). The circuit court denied the motion (*id.* at 292–93). Petitioner appealed the decision to the First DCA, Case No. 1D15-3740  (Ex. LL). The First DCA affirmed per curiam without written opinion on November 6, 2015, with the mandate issuing January 21, 2016 (Exs. NN, PP). Reese v. State, 182 So. 3d 644 (Fla. 1st DCA 2016) (Table).

Petitioner, through counsel, filed the instant federal habeas action on January 14, 2016 (ECF No. 1). Petitioner filed a second amended petition on February 14, 2017, which is the operative pleading (ECF No. 20).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant

> the writ if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely

because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law.  See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants:  "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. See Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal

principles set forth in the Supreme Court's cases.  The federal court defers to the state

court's reasoning unless the state court's application of the legal principle(s) was

"objectively unreasonable" in light of the record before the state court.  Williams, 529

U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed.

2d 683 (2004) (per curiam).   In applying this standard, the Supreme Court has

emphasized:

> When reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning their
> decisions only when there could be no reasonable dispute that they were
> wrong.  Federal habeas review thus exists as "a guard against extreme
> malfunctions in the state criminal justice systems, not a substitute for
> ordinary error correction through appeal."   Harrington, *supra*, at
> 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the

merits in state court where that adjudication "resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination

of the facts" standard is implicated only to the extent the validity of the state court's

ultimate conclusion is premised on unreasonable fact finding.  *See* Gill v. Mecusker,

633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance."  Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g.*, Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *See* Cave v. Sec'y for

Dep't of Corr., 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has

declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate

court's summary affirmance, where it found that the validity of the state court decision

was not premised on the trial court's unreasonable fact finding, and that the petitioner

failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an

insufficient factual basis for affirming the state court's decision."  Gill, 633 F.3d at

1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA

and § 2254(d), does the court take the final step of conducting an independent review

of the merits of the petitioner's claims.  See Panetti, 551 U.S. at 954.  Even then, the

writ will not issue unless the petitioner shows that he is in custody "in violation of the

Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this

standard is difficult to meet, that is because it was meant to be."  Richter, 562 U.S. at

102.

III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition

that the petitioner have exhausted available state court remedies, 28 U.S.C.

§ 2254(b)(1),[2] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as

---

[2] Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
    (A)  the applicant has exhausted the remedies available in the courts of the State; or
      (B) (i)  there is an absence of available State corrective process; or
        (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.

In announcing that "the substance of a federal habeas corpus claim must first be

presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention

that the petitioner satisfied the exhaustion requirement by presenting the state courts

only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general

appeal to a constitutional guarantee as broad as due process to present the "substance"

of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276,

74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a

jury instruction violated due process because it obviated the requirement that the

prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459

U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39

(1979)).  The only manner in which the habeas petitioner cited federal authority was

by referring to a state court decision in which "the defendant . . . asserted a broad

federal due process right to jury instructions that properly explain state law."

Anderson, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a

state-court decision predicated solely on state law was sufficient to fairly apprise a

reviewing court of a potential federal claim merely because the defendant in the cited

case advanced a federal claim.  *Id.*, 459 U.S. at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.

In Baldwin v. Reese, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar

---

[3]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

document) that does not alert it to the presence of a federal claim in order to find

material, such as a lower court opinion in the case, that does so." 541 U.S. 27, 32, 124

S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The <u>Baldwin</u> Court commented that "a litigant

wishing to raise a federal issue can easily indicate the federal law basis for his claim

in a state-court petition or brief, for example, by citing in conjunction with the claim

the federal source of law on which he relies or a case deciding such a claim on federal

grounds, or by simply labeling the claim 'federal.'" *Id.*, 541 U.S. at 32.  With regard

to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291

(11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor
> indeed for petitioners seeking to establish exhaustion.  However, we
> agree with the district court that this language must be "applied with
> common sense and in light of the purpose underlying the exhaustion
> requirement[:] 'to afford the state courts a meaningful opportunity to
> consider allegations of legal error without interference from the federal
> judiciary.'" <u>McNair</u> [v. Campbell], 315 F. Supp. 2d [1277,] 1184 [(M.D.
> Ala. 2004)] (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct.
> 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law
> established by the Supreme Court. . . . We therefore hold that "'[t]he
> exhaustion doctrine requires a habeas applicant to do more than scatter
> some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[4]

---

[4] In  his initial brief before the Court of Criminal Appeals, the petitioner cited one federal
case in a string citation containing other state cases, and in a closing paragraph in his argument that
extraneous materials were considered by the jury during deliberations, stated that there was a

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review.  Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 & n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be

---

violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  *Id.*

futile under the state's procedural default doctrine. <u>Bailey</u>, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id*. A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* <u>Harris v. Reed</u>, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. <u>Lee v. Kemna</u>, 534 U.S. 362, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5] *Id.* Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *Id.* Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must

---

[5] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. <u>Marek v. Singletary</u>, 62 F.3d 1295, 1302 (11th Cir. 1995); <u>Alderman v. Zant</u>, 22 F.3d 1541, 1549 (11th Cir. 1994).

be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*  Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence.  *See* <u>McQuiggin v. Perkins</u>, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013).  As the Court stated in <u>Schlup</u>, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]."  513 U.S. at 332; *see also* <u>House v. Bell</u>, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Petitioner's claims.

## IV.  PETITIONER'S CLAIMS

A.  <u>Ground One:  "The prosecution perpetuated a fraud on the court when it presented its evidence."</u>

<u>Ground Two:  "The prosecution engaged in evidence tampering at trial, and at the evidentiary hearing."</u>

<u>Ground Three:  "The prosecution committed color of law violations."</u>

Petitioner claims that the State manipulated the evidence which was provided to the defense in discovery, which was presented to the jury at trial, and which was presented to the state court during the evidentiary hearing in the first post-conviction proceeding, in violation of Petitioner's Fifth, Sixth, and Fourteenth Amendment rights

(ECF No. 20 at 6–25; ECF No. 39 at 2–14).  Petitioner alleges a detective with the State Fire Marshal ("SFM"), Tommy Barron, photographed the fire scene and collected samples of fire debris for testing by the State arson lab to determine the presence of accelerants.  Petitioner alleges Detective Barron also prepared a diagram of the fire scene, showing where he took the photos and collected the samples. Petitioner alleges the State "manipulated" the SFM's photographs by printing them in 3"x5" black and white format, instead of 8"x10" color glossy format.  Petitioner states after trial and prior to the evidentiary hearing in the first Rule 3.850 proceeding (throughout which he was represented by retained counsel) he requested and received records from the SFM lab, including a copy of the original source of the photographs (i.e., the compact disc ("CD") submitted by SFM Barron to the SFM lab containing the digital images of Barron's photographs), copies of some of SFM Barron's fire scene photographs in 8"x10" format, and the SFM lab case file (*see* ECF No. 20 at 24; *see also* Ex. JJ at 22–27, 32–110).  Petitioner asserts that examination of the CD shows that SFM Detective Barron did not number the photographs in the same sequence in which he took/created them.  Petitioner asserts that examination of the photographs in a different format (i.e., 8"x10" color glossy format) shows that (1) some of Detective Barron's trial testimony with respect to where he collected samples

of fire debris was false, (2) some of Barron's testimony regarding what some of the photographs depict was false, (3) some aspects of Barron's diagram depicting where he took the photographs and collected the samples of debris were false, and (4) Barron may have "cross-contaminated" debris samples, which rendered the results of the forensic testing of those samples unreliable.  Petitioner contends the State's use of the 3"x5" black and white photos constituted a manipulation of the evidence to make it appear that Petitioner set the fire, when the evidence instead strongly pointed to Susan Baggett (the owner of the house and Petitioner's then-girlfriend) as the arsonist.

Petitioner also asserts that Jason Daffin, an investigator with the Bay County Sheriff's Office, failed to follow SFM standard operating procedures in effect at the time of the SFM's investigation (ECF No. 20 at 15–17).  Petitioner alleges Daffin produced biased and false reports of the arson (*id.* at 26–27).

Petitioner claims that the State violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to provide the defense with photos in a "readable format" (i.e., 8"x10" color glossy photos, instead of 3"x5" black and white photos) (ECF No. 20 at 17–19, 39–41).  Petitioner argues this was crucial, because the smaller photos were not complete images (the smaller photos cropped some of the original images) (*id.*).  Specifically with regard to a photo of the three cans containing

samples of fire debris collected by Detective Barron, Petitioner alleges, "In the previous small black-and-white version of this photo, the writing on the can was illegible.  But the new color 8 x 10 revealed startling information had been hidden by the State's discovery set of photos" (*id.* at 11).  Petitioner contends the State's failure to provide the photos in 8"x10" color photo format constituted suppression of evidence under Brady.

Petitioner also contends the State violated Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), because SFM Detective Barron engaged in "deliberate deception through his false reports" (ECF No. 20 at 19–21).

Petitioner contends the State also manipulated the evidence at the post-conviction evidentiary hearing by putting the photographs in a different order than they were presented at trial, and by presenting five of the photographs in a different format (8"x10" color Xerox photocopies, instead of the 3"x5" black and white photos used at trial) (ECF No. 20 at 21–22; ECF No. 39 at 6–12).  Petitioner argues this prevented him from proving his claims in the post-conviction proceedings.

Respondent concedes Petitioner exhausted Grounds One, Two, and Three by presenting his arguments to the state court in his second and third Rule 3.850 motions (ECF No. 32 at 16, 23, 25).  Respondent asserts the state court dismissed the second

Rule 3.850 motion for lack of jurisdiction, because the claims related to issues pending on appeal of the circuit court's denial of the first Rule 3.850 motion (*id.* at 17).  Respondent asserts after the appeal concluded, Petitioner presented his claims in a third Rule 3.850 motion, but the court dismissed the motion as untimely and successive (*id.* at 17–18).  Respondent asserts all available procedural bars (*id.* at 11).  Respondent contends the state court's adjudication of Petitioner's claims was not contrary to or an unreasonable application of clearly established federal law (*id.* at 19–26).

      1.     Clearly Established Federal Law

As recognized in Brady and its progeny, principles of due process dictate that, in a criminal proceeding, the prosecution must disclose evidence favorable to the defendant.  Brady, 373 U.S. at 87; Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004).  To establish a Brady violation, a defendant must prove three essential elements:  (1) that the evidence was favorable to the defendant, either because it is exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either willfully or inadvertently; and (3) that the suppression of the evidence resulted in prejudice to the defendant.  Turner v. United States, — 582 U.S. —, 137

S. Ct. 1885, 1893, 198 L. Ed. 2d 443 (2017); <u>Banks</u>, 540 U.S. at 691; <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).

To establish prejudice, the defendant must show that the suppressed evidence was material.  <u>Banks</u>, 540 U.S. at 691.  The evidence rises to the level of materiality within the meaning of <u>Brady</u> when there is a reasonable probability that, had the suppressed evidence been disclosed, the result of the proceeding would have been different.  <u>Turner</u>, 137 S. Ct. at 1893.  "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial."  *Id.* (internal quotation marks and citations omitted).

In determining whether disclosure of the suppressed evidence might have produced a different result, the court must consider the "totality of the circumstances." <u>United States v. Bagley</u>, 473 U.S. 667, 683, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). The court "must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,' and determine in light of that examination whether 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" <u>Turner</u>, 137 S. Ct. at 1893 (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), and <u>Cone v. Bell</u>, 556 U.S. 449, 470, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009)).

"Giglio error, a species of Brady error, occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury."  Ford v. Hall, 546 F.3d 1326, 1331 (11th Cir. 2008).

2.    Federal Review of State Court Decision

Petitioner presented claims of "newly discovered evidence" and the State's alleged fraud and manipulation of the evidence in his second and third Rule 3.850 motions (Ex. HH at 10–11, 16; Ex. JJ at 1–17).  The state circuit court dismissed the second Rule 3.850 motion for lack of jurisdiction (Ex. HH at 83–84).  The circuit court adjudicated the claims presented in the third Rule 3.850 motion as follows:

> In a prior Motion for Post Conviction Relief filed September 27, 2010, the Defendant raised three (3) grounds that challenged his conviction in the instant case.  One of the grounds challenged his trial counsel's failure to hire an arson expert to testify in response to Fire Marshall [sic] Tommy Barron's alleged inadequate investigation of the fire. After an evidentiary hearing, the Defendant's motion was denied. The First District Court of Appeal per curiam affirmed this Court's decision. (*See* Mandate and Opinion, 1Dl3-5931.)

> The Defendant now files the instant motion nearly six years after his conviction and sentence became final, alleging "newly discovered evidence."   The Defendant asserts that he has "newly discovered documentation and substantial evidence" from Ann Walker, a forensic technologist from the arson laboratory.  He states that he used the Public Records Act to request "any relevant records" from the lab in his case. Among these records received by his post conviction counsel was an

"Evidence Destruction form."  He asserts that this form was first received by him on March 8, 2012.  The Defendant claims that he pursued more information from Ann Walker on April 9, 2012.  Ms. Walker responded by directing the Defendant to the Bureau of Fire and Arson Investigation report "that was already in his possession."  The Defendant states that this report reflects that evidence can "Q-1" was fire debris collected from the living room floor approximately 20 feet inside the doorway, and evidence can "Q-2" was fire debris collected from the living room floor approximately 2 feet inside the front doorway.  The Defendant also asserts that the diagram prepared by Tommy Barron had the cans in those respective locations.  At trial, the Defendant states that the evidence used to convict him was based upon testimony that can Q-2 was found 2 feet inside the door, and this was where the Defendant was standing at the time the fire started.  However, he states that a photograph of these cans show the opposite; more specifically, "the labels on the cans clearly indicates [sic] that can Q-1 held evidence collected 2 ft. inside the living room and can Q-2 contained evidence collected 20 feet inside the living room."  In support, the Defendant refers to "Appx. G," which is an attached exhibit that he describes as "a picture of the cans provided to the Defendant from the Bureau of Fire and Arson Investigation on 10/1/10, in satisfaction of his public records request."  The Defendant asserts that the evidence cans relied upon by Detective Barron to support his conclusion that the Defendant started the fire actually contained evidence found where the other occupant of the house was standing and not the Defendant.

The Defendant also claims that the State's crime scene photographs were presented out of sequence at the trial.  During the post conviction proceedings, his counsel had access to these photographs and the original sequence in which they were taken.  The Defendant asserts that he received copies after the direct appeal of his post conviction denial.[FN 1]  The Defendant claims that when he compared the sequence of the original photos to the sequence used at trial, this reveals that "the asserted locations of evidence found were inaccurate and does not support the conclusion of Defendant's guilt."

[FN 1:  In his sworn memorandum of law, the Defendant claims that he received "true and correct copies of the photos taken by Fire Marshall [sic] Barron during his investigation" from Ann Walker in 2010.  (*See* Def.'s Memorandum at 4.)  He also notes that post conviction counsel discovered the sequence discrepancy in January 2010.  *Id.* at 5.

The Defendant alleges that the above evidence was unknown at the time of trial, could not have been discovered by the exercise of diligence, and would probably produce an acquittal on retrial.  He asserts that he could not have discovered the falsified photo evidence until he received the information requested from Ann Walker.  He states that the evidence cans were destroyed pursuant to the arson lab policy and on the direction of the Fire Marshall [sic].  The Defendant explains in his memorandum of law that this evidence would have produced an acquittal in his case.  The Defendant and his girlfriend were the only eyewitnesses to the arson and each blamed the other person for starting the fire.  The Defendant claims that the guilty verdict was solely attributable to Fire Marshall [sic] Barron's falsified testimony and investigation.

In order to obtain relief based on newly discovered evidence, a defendant must meet two requirements.  First, the evidence must not have been known by the trial court, the party, or defense counsel at the time of trial, and it must also appear that neither the defendant nor defense counsel could have known of such evidence by the use of diligence.  Second, the newly discovered evidence must be of a nature that it would probably produce an acquittal on retrial or yield a less severe sentence.  *See Archer v. State*, 934 So. 2d 1187 (Fla. 2006); *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998).  Rule 3.850(b)(l) requires that all newly discovered evidence claims are filed within two years from the time that the evidence could have been discovered with the exercise of diligence.  *See Blake v. State*, 152 So. 3d 66, 68 (Fla. 2d DCA 2014).

This Court finds that the evidence mentioned in the Defendant's motion is not "newly discovered evidence" that would allow him to

circumvent the two-year filing period found in Rule 3.850.   The Defendant's motion primarily focuses on two "new" discoveries: 1) the locations of evidence cans Q-1 and Q-2 were inaccurate, and 2) the photograph sequence presented at trial was not the original sequence of the photographs as taken during the investigation.[FN 2]  These issues were part of the Defendant's prior Motion for Post Conviction Relief. (*See* Motion for Post Conviction Relief at 6–8.)  Furthermore, the Defendant actually refutes his claim that this evidence is "newly discovered," as he admits that his discovery regarding the location of the evidence cans was made when Ms. Walker directed him to the arson report that was already in his possession.  He also states that the picture of the evidence cans was provided to him on October 1, 2010.  Thus, the alleged discrepancies between the photograph and the Fire Marshall's [sic] report and testimony at trial could have been previously discovered by the Defendant through the use of due diligence.  In addition, the Defendant admits that the "original sequence" of the crime scene photographs was compared to the sequence presented at trial by post-conviction counsel in January 2010.[FN 3]  Thus, even if this was "newly discovered evidence," the Defendant by his own allegations indicates that this evidence was discovered in 2010 prior to the filing of his original motion for post conviction relief.  Accordingly, his claims are untimely.  *See Blake*, 152 So. 3d at 68 (noting that a newly discovered evidence claim must be filed within two years from the date that the evidence could have been discovered with the exercise of due diligence).

[FN 2:  The Defendant also mentions the photographs at trial were cropped from their original size, but he does not explain how this is newly discovered evidence.  Again, the Defendant admits in his memorandum that he was provided "true and correct copies" of the original photographs in 2010.]

[FN 3:  The Defendant's appendix also includes a letter to his post conviction counsel dated July 28, 2010 in which

> the Defendant points out the discrepancy in the sequence of these photographs. *See* "Appendix H."]
>
> The Defendant has simply failed to demonstrate the first prong of the newly discovered evidence standard—that neither he, his attorney nor the court knew of this evidence or could have discovered it through the use of diligence. Not only was the Defendant apparently aware of this evidence in 2010, these issues were addressed during the prior post-conviction proceeding. (*See* Transcript of Evidentiary Hearing at 14–15, 18–19.) Thus, this claim is successive. *See* Fla. R. Crim. P. 3.850(h)(1). The remaining claims of the Defendant's motion and memorandum are simply attempts to further challenge the Fire Marshall's [sic] investigation by arguing that his diagram misrepresented the crime scene, that evidence was tampered with, that fraud was committed by the Fire Marshall [sic], and that the State Attorney misled his expert witness at the evidentiary hearing. However, none of these claims actually point to any newly discovered evidence. Thus, the Defendant's claims are untimely. Accordingly, his motion is due to be dismissed. *See* Fla. R. Crim. P. 3.850(b)(l), 3.850(h)(2).

(Ex. KK at 249–51). The First DCA affirmed the decision without written opinion (Ex. NN).

Federal courts "will not review judgments of state courts that rest on adequate and independent state grounds." <u>Michigan v. Long</u>, 463 U.S. 1032, 1041, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). Thus, "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto.'" <u>Harris v. Reed</u>, 489 U.S. 255, 262, 109 S. Ct. 1038, 130 L. Ed. 2d 306 (1989) (quoting

Murray v. Carrier, 477 U.S. 478, 485, 106 S. Ct. 2639, 91 L. Ed 2d 397 (1986)).  The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision which precludes federal habeas review.  *See*  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.  *Id.*  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  *Id.*  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

Here, the state court clearly and expressly stated it was relying on state procedural rules to resolve Petitioner's claims.  Second, the state court's decision on the procedural issue rested entirely on state law grounds and was not intertwined with an interpretation of federal law.  Third, the state procedural rule was firmly established in Rule 3.850(b) of the Florida Rules of Criminal Procedure.  The state court's procedural ruling constitutes an independent and adequate state rule of decision which precludes federal habeas review.

Notwithstanding the procedural default, Petitioner's federal claims are without merit. The record includes numerous exhibits submitted by Petitioner in the state post-conviction proceedings. Among the exhibits was a copy of Petitioner's public records requests to the Bureau of Forensic Fire and Explosive Analysis (formerly known as the State Fire Marshal, *see* ECF No. 20 at 15 n.1) (Ex. JJ at 21–66). Petitioner's requests included several questions, which were answered by Ann Walker, a Forensic Technologist (*see id.*). According to Ms. Walker's responses, SFM Detective Barron submitted digital images to the SFM lab via the United States Postal Service (*id.* at 53). Ms. Walker stated that Detective Barron submitted the flash card/drive with a submission form to show the case number, submitter, and a detailed description of the property being submitted (*id.*). Ms. Walker stated that the lab uploaded the digital images from the flash drive onto a DVD for archiving (*id.*). Ms. Walker stated that on the submission form, Detective Barron requested 2 sets of 3"x5" prints and a CD (*id.*). Ms. Walker stated that the lab mailed the prints and CD to Detective Barron (*id.*). Ms. Walker stated that the back of each photograph did not contain a seal or special code stating that it was reproduced at the lab (*id.*).

In another response from Ms. Walker (submitted by Petitioner as Exhibit C in his appeal of the decision in the first Rule 3.850 proceeding), she states:

In reference to your statement and questions about receiving 4x6 prints instead of the requested size of 3x5s, our new machine (Noritsu dDP 421) only prints 4x6, 5x7 and 8x10.  The photo printing machine that we used years before this one printed a smaller size of 3x5s.  Since your payment was actually for a print size of 5x7s, you received that size even though 4x6 is our smallest sized prints and we do not have an option to print 3x5s.

I am not sure of the numbering system that was issued on the back of Inv. Barron's photos at that time.  The prints we have has numbers 0114-0154 with coloring and density information on the back.  I am not sure about the numbering you said his flash card had.  The setting could have changed on the machine since that time as well.  What is important is that these are the same photographic evidence that was submitted to the lab in reference to the fire scene and are being printed directly from the digital images.

(Ex BB).

Specifically with regard to the photograph of the three evidence collection cans, Forensic Technologist Walker stated that the SFM's investigations unit places labels on the items of evidence (in this case, the containers/cans containing samples of fire debris collected by Detective Barron) containing information which should correspond to the information recorded in the investigative report (Ex. JJ at 42). Walker stated that upon the SFM lab's receipt of the evidence, technologists verify that the agency case number and items listed on the submission form correspond to the physical items of evidence (*id.*).  Walker stated that the technologist then assigns a lab case number and item number to each item of evidence, and indicates this on the

submission form for cross reference and tracking (*id.*).  Walker stated that the lab has a practice of photographing the evidence when it is received (*id.*).  The photograph captures the agency case and item numbers, and "cross relates" between the evidence submission form and the evidence/container (*id.* at 42, 55–56).

The evidence submission form (submitted by Petitioner as an exhibit to his second Rule 3.850 motion) lists Detective Barron as the "submitter" (Ex. HH at 52). It lists the evidence as three items of fire debris, identified as Q-1, Q-2, and Q-3, and requests that the lab test the evidence to determine the presence/identity of ignitable liquids (*id.*).  The lab report indicates that gasoline was found in all three exhibits (*id.* at 54).

The photo request form submitted by Detective Barron to the lab (which Petitioner submitted as an exhibit to his second Rule 3.850 motion) indicates that Barron submitted a disc and requested 2 sets of 3x5 pictures, as well as a disc (Ex. HH at 53).  Detective Barron's reports are included in the state court record (*id.* at 56–73).

Upon review of Petitioner's submissions, the undersigned concludes that Petitioner failed to demonstrate that the State suppressed the SFM's photographs of the fire scene.[6]  Photographs of the images captured by SFM Detective Barron's

---

[6] Petitioner appears to have admitted as much in his successive Rule 3.850 motion when he stated:

investigation of the fire scene were admitted at trial without objection from the defense. Photographs are produced from primary images captured with a camera. The State's providing such images in 3"x5" black and white format, instead of 8"x10" color glossy format, does not render the photographs "suppressed" for <u>Brady</u> purposes. Further, Petitioner has not shown that the State suppressed any reports concerning the SFM's investigation of the scene or testing of the fire debris collected from the scene. At trial, Petitioner's defense counsel cross-examined SFM Detective Barron about his reports, diagram, and fire scene photographs, as well as the results of the testing of the debris he collected from the scene (*see* Ex. C at 215–41). Because Petitioner failed to demonstrate that any of this material was undisclosed, his <u>Brady</u> and <u>Giglio</u> claims fail as to these materials. *See* <u>Hammond v. Hall</u>, 586 F.3d 1289, 1308–09 (11th Cir. 2009) (holding that <u>Giglio</u> claim failed because the evidence was known by the defense).

---

It is important to note that the (41) 4x6 and 8x10 photographs, photograph numbering order, and the photograph capturing times used to demonstrate the Walk of Flame brief were documented by Fire Marshal Barron and the State Fire Marshal's Arson Laboratories. The same photographic evidence was not submitted as evidence in the Reese arson trial. <u>However, this same photographic "evidence" was available as documented discovery.</u>

The (41) 3x5 photographs and numbering order that were submitted into evidence at the Reese arson trial were fraudulent.

(Ex. KK at 244) (emphasis added).

To the extent Petitioner contends the State failed to disclose the SFM's standard

operating procedures, Petitioner has not cited any authority for his contention that

disclosure of such material was required by Florida's criminal procedural rules.  Nor

has Petitioner shown that the State was obligated to disclose these materials under

Brady.  *See, e.g.*, United States v. Newby, 251 F.R.D. 188, 190 (E.D.N.C. 2008)

(granting criminal defendant's request for subpoena or order compelling the

government to turn over investigative agency's standard operating procedures, since

government did not have obligation to turn the materials over under Brady or Giglio).

Therefore, Petitioner's Brady and Giglio claims fail as to these materials.

The only material that arguably might have been "suppressed" for Brady

purposes (or "undisclosed" for Giglio purposes) is the lab photo showing the three

labeled cans containing fire debris collected by Detective Barron during his fire scene

investigation, and submitted to the lab for testing for the presence of accelerants (*see*

ECF No. 20, Ex. 7).[7]  The photo shows that the label of the 1-gallon collection can

says "Q-2," but the label describes the collection site as 20 feet inside the front

---

[7] The undersigned says "might have been" because Petitioner's allegations as to whether this
photograph was produced during discovery are unclear.  Petitioner alleges the photo was not
provided to the defense prior to trial (*see* ECF No. 20 at 39), yet he also alleges the photo was not
produced "in a readable format" before trial (*see id.* at 17) and refers to the "color photo" as the
alleged Brady material (*see id.* at 39), which suggests the photo was produced before trial but in a
different format.

doorway, which is the collection site identified as "Q-1" in Detective Barron's fire scene photos (which show the 1-gallon can located at the collection site at the rear of the living room), Barron's report, Barron's diagram, and Barron's trial testimony (*see* Ex. C at 239–40, Ex. HH at 50–51, 58).  The photo further shows that the label of the 1-quart collection can says "Q-1," but Detective Barron's fire scene photos show the 1-quart can located just inside the front doorway, which is the site identified as "Q-2" in Barron's report, Barron's diagram, and Barron's trial testimony (*see id.*).  The photo confirms that Barron collected fire debris from three locations (two in the living room and one in the garage), and there is no dispute that the test results of all of the debris was positive for the presence of gasoline.  So the only new information that the photo reveals is that the "Q" numbers written on two of the cans (the cans containing debris from the living room) were not consistent with the "Q" numbers indicated by all of the other evidence and Barron's testimony.  It is Petitioner's burden to demonstrate that there is a reasonable probability he would have been acquitted if the jury had been presented with this "suppressed" photograph of the  labeled collection cans.

Detective Barron's opinion that the fire started near the front doorway was based upon his personal observations of the fire scene, specifically, a melted gas can located just inside the front doorway and a burn pattern indicating that the fire burned

from the front doorway back into the house, and from the front doorway out the front

door.  Detective Barron testified:

> We had a very large area of origin that was in the, right inside the front
> doorway that extended into the living room area and the fire burnt from
> the front doorway back into the house and out the front doorway.

(Ex. C at 192, 211).  Detective Barron testified he observed the remains of a melted

gas can located 2–3 feet inside the front doorway (*id.* at 193–94, 206).  Barron

testified that the hottest, heaviest base of the fire was from the front door where he

found the gas can, and the fire burned from there inward (*id.* at 233, 241).  Detective

Barron testified that the house had a loft space directly above the front doorway (*id.*

at 204).  Barron testified that he observed a burn pattern going straight up from inside

the front doorway into the loft area (*id.* at 201–11).  Barron repeated that the heaviest

fire damage was just inside the front doorway and extended from that area (*id.* at 234).

He testified that as he stood at the front doorway, he observed one of the studs/support

posts which had deeper charring on the front than on the back, which indicated the

pattern of the fire from the front of the house to the back (*id.* at 204–05, 207, 211).

Barron testified that the further he walked from the front door to the back of the living

room, the cleaner the studs were (*id.* at 205).  Detective Barron testified that he did not

observe any fire damage in the office, which was located beyond the living room to

the rear of the house (*id.* at 228).  Barron testified that he observed severe heat damage

where a car was parked outside the front of the house, and he observed charring and

burning down the front exterior of the house to the bottom of the front doorway (*id.*

at 210, 226–27).

Detective Barron admitted at trial that his photographs did not depict the burn

pattern (Ex. C at 225–26, 234).  Detective Barron testified that the purpose of his

diagram and photographs was to "log where you've been, what you photographed and

keep everything straight" (*id.* at 197).  And Barron admitted that the lab results from

the testing of the fire debris samples he collected from three sites (two in the living

room and one in the garage) did not evidence a burn pattern, since all of the samples

tested positive for the presence of gasoline, but they were not tested to determine the

saturation level of the gasoline (i.e., how much gasoline was at each location), or the

age of the gasoline (i.e., how long it had been at each location) (*id.* at 225–26, 229).

The only new information contained in the "suppressed" photo of the labeled

collection cans is that Detective Barron wrote "Q-2" on the label of the gallon-sized

can which his report, diagram, and photographs showed was collection site "Q-1"

(approximately 20 feet inside the front doorway, as Barron indicated on the label

itself), and Barron wrote "Q-1" on the label of the quart-sized can which his report,

diagram, and photographs showed was collection site "Q-2" (approximately 2 feet inside the front doorway). So defense counsel could have used the lab photo to impeach Detective Barron's credibility by showing that his documentation procedure was inaccurate. However, as will be discussed *infra*, defense counsel had ample opportunity to effectively impeach Barron's credibility by pointing out deficiencies in his investigation.

Furthermore, Detective Barron's opinion that the fire started just inside the front doorway was not the only evidence that Petitioner started the fire. Suzanne Baggett was in the house when the fire started. She testified she was sitting in the office, located past the living room at the rear of the house and next to the garage, when she noticed Petitioner walk behind her through the office into the garage (Ex. B at 53). Ms. Baggett testified that Petitioner walked back from the garage through the office and into the house (*id.*). Then Petitioner walked through the office into the garage a second time (*id.*). And then he walked back from the garage through the office and into the house (*id.*). Ms. Baggett testified that she and Petitioner had just argued, and she was getting onto the computer to buy Petitioner a bus or plane ticket to go to Tampa (*id.*). She testified that as Petitioner passed her in the office, he said something to the effect of, "We are done" or "You're right, we're done" (*id.*). Ms. Baggett

testified that the second time Petitioner passed her while walking from the garage into the house through the office, she saw "a little flash of red" (*id.*). Ms. Baggett testified that she arose from the computer and stood "at the end of the hallway" at "a little piece of wall . . . between the office and the bedroom," and saw Petitioner dumping gasoline all over the living room floor (*id.* at 54–55). Ms. Baggett testified that Petitioner was holding a big plastic container and dumping gasoline on the floor "back and forth as he was backing up towards the doorway" (*id.* at 55). Ms. Baggett testified that Petitioner threw the plastic container on the floor (*id.*). She testified she asked, "What the F are you doing?" and Petitioner responded "Hey, watch this, Suz, this will be cool, we're done" (*id.*). Ms. Baggett testified that Petitioner grabbed kitchen matches, struck a match, and put the match down (*id.* at 55–57). She testified she heard a "whoof" and then saw flames (*id.* at 56). Ms. Baggett testified that when Petitioner lit the match, he was standing at the front door of the house and she was at the back of the house (*id.* at 62). She testified that she first thought she would run through the office to the garage to get outside, but she heard explosions and popping, so she turned the other way into the bedroom and escaped through the bedroom window (*id.* at 57–58). Ms. Baggett testified that she ran up the side of the house to the front corner, and saw Petitioner standing in the front of the house (*id.* at 58).

Petitioner testified that Suzanne Baggett started the fire (Ex. D at 261).  He testified he was standing in front of the garage smoking a cigarette, and then walked into the front door of the house and saw a gas can in the middle of the living room tipped over and spilling gasoline (*id.* at 261–62).  Petitioner testified he asked, "What the F are you doing?" (exactly the same question that Ms. Baggett asked of Petitioner), and "all she did was flip a stick match and it ignited the fire" (*id.* at 262).  Petitioner testified he suffered burns on his legs and back as he turned around and ran back out the front door (*id.* at 262–63).

But on the night of the fire, Petitioner told Deputy Jonathan Jones, who responded to the scene as the fire was burning, a different story as to how the fire started.  Deputy Jones testified that when he arrived at the scene, he asked Ms. Baggett what happened, and she stated that her boyfriend tried to kill her (Ex. C at 132).  Jones testified that Petitioner walked up and interrupted Ms. Baggett, saying, "No, that's not what happened" (*id.* at 133).  Deputy Jones testified that Petitioner then offered his explanation as to where and how the fire started, specifically, that he was in the garage smoking a cigarette next to propane tanks in the garage, and that is where the fire started (*id.* at 133–34).  Petitioner did not tell Deputy Jones that Ms. Baggett started the fire in the living room.

Petitioner told Investigator Jason Daffin a third story. After Petitioner spoke with Deputy Jones at the scene, Petitioner was taken to the hospital for treatment of the burns he suffered. Investigator Daffin testified that he met with Petitioner at the hospital (Ex. C at 168–69). Daffin testified that he asked Petitioner if he knew what happened and how the fire started, and Petitioner continuously stated, "my house caught fire" (*id.*). Investigator Daffin testified he asked Petitioner where he was when he first realized the house was on fire, and Petitioner responded he was "out by the road" (*id.* at 169). Daffin asked Petitioner to clarify whether he was near the road or actually in the road, and Petitioner stated, "I was in the road" (*id.*). Investigator Daffin asked Petitioner how he sustained the burns to his legs, and Petitioner responded that he did not know (*id.*). Daffin asked Petitioner if he went into the house once he realized it was one fire, and Petitioner responded that he did not (*id.*). Investigator Daffin testified that Petitioner did not mention smoking in the garage (*id.*).

Considering the "suppressed" photo in the context of the trial record, Petitioner failed to demonstrate a reasonable probability that the jury would have acquitted him of the arson charge if the photo of the labeled fire debris collection cans had been provided to the defense. Therefore, Petitioner failed to show that the photo was "material" as required under <u>Brady</u>.

With respect to Petitioner's claim that the State deprived him of his Fifth, Sixth, and Fourteenth Amendment rights to a fair post-conviction evidentiary hearing by using different photographs and a different photo sequence than used at trial (*see* ECF No. 20 at 17–25; ECF No. 39 at 6–7), it is well established that due process violations that allegedly occur during state proceedings collateral to the revocation proceeding do not form the basis of habeas relief.  *See* Carroll v. Sec'y, Dep't of Corr., 574 F.3d 1354, 1365–66 (11th Cir. 2009); Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004).  A decision in a state collateral proceeding is not a criminal judgment, or executive agency equivalent, that resulted in the prisoner's detention.  *See* Carroll, 574 F.3d at 1365 ("[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment—i.e., the conviction itself . . . .").  Collateral proceedings are instead "civil in nature and are not part of the criminal proceeding itself."  Pennsylvania v. Finley, 481 U.S. 551, 556–57, 107 S. Ct. 1990, 1994, 95 L.Ed. 2d 539 (1987).  Therefore, procedural violations during state collateral proceedings are "issues unrelated to the cause of the petitioner's detention."  Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987).  As such, they cannot form the basis for habeas relief.  *See* Carroll, 574 F.3d at 1365 (holding that a failure to hold an evidentiary hearing in a state post-conviction proceeding was not a basis for habeas

relief); *see also* <u>In re Rutherford</u>, 437 F.3d 1125, 1127 (11th Cir. 2006) (finding insufficient for habeas relief the petitioner's claim that the state post-conviction court denied him due process by failing to provide mental health records of a person the petitioner alleged had actually committed the crime); <u>Quince</u>, 360 F.3d at 1262 (rejecting federal habeas petition which alleged that the state judge presiding over the petitioner's post-conviction hearing denied the petitioner due process by not recusing himself, because the claim did not relate to the petitioner's conviction).

As a final matter, the court rejects Petitioner's suggestion that the court "find color of law violations, and provide a § 1983-type remedy (e.g. new trial)" (*see* ECF No. 20 at 25–27; ECF No. 39 at 12–13).  Petitioner claims that SFM Detective Barron's "manipulation" of the fire scene evidence and Investigator Daffin's "biased false reports" and failure to follow the SFM's standard operating procedures were the basis of Petitioner's false arrest and malicious prosecution, in violation of the Fourth Amendment (ECF No. 20 at 26–27).  Petitioner contends the State deprived him of his federal right to a fair trial by failing to provide a full set of SFM Detective Barron's photos in 8"x10" color glossy format (*id.* at 25–26).

The Supreme Court has made clear that habeas corpus is the specific instrument to obtain release from "any confinement contrary to the Constitution or fundamental

law . . . ." *See* <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 485–86, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973) (citations omitted).  Therefore, § 2254 provides the exclusive framework for consideration of Petitioner's claims.

      B.   <u>Ground Four</u>: <u>"Petitioner was given ineffective assistance of counsel at his state trial, and at his subsequent 3.850 evidentiary hearing."</u>

Petitioner presents six claims of ineffective assistance of trial counsel ("IATC"):  (1) counsel failed to have a forensic arson investigator go to the scene of the fire before the building was razed and then testify at trial; (2) counsel failed to hire a medical expert; (3) prior to trial, counsel failed to obtain reports, photos, and diagrams generated by the State; (4) counsel failed to file a <u>Daubert</u> challenge to the fire scene investigation; (5) counsel failed to object to improper closing argument by the prosecutor; and (6) counsel failed to request a special jury instruction regarding spoliation of evidence (ECF No. 20 at 27–47).

Respondent contends the majority of Petitioner's IATC claims were not presented to the state courts and thus not exhausted (ECF No. 32 at 27–41). Respondent contends the unexhausted claims are now procedurally barred under state law.  As to the exhausted claims, specifically, the claim that counsel failed to present testimony of a forensic arson investigator, and counsel failed to object to improper

closing argument, Respondent contends the state court's adjudication of those claims

was not contrary to or an unreasonable application of clearly established federal law.

### 1.    "Counsel was ineffective for not having a forensic arson investigator go to the scene of the fire *before* the building was razed, and not having a forensic arson investigator testify at trial."

Petitioner alleges he hired trial counsel approximately three days after the fire

(ECF No. 20 at 27–37).  Petitioner acknowledges that trial counsel hired an arson

investigator, and the investigat 3:18cv391 or agreed with the SFM investigator's

opinion that Petitioner started the fire (*id.*).  However, Petitioner contends counsel

should have hired an investigator sooner, specifically, before the house was razed,

which occurred three months after the fire (*id.*).  Petitioner also contends trial counsel

should have hired a second defense expert to evaluate the case (*id.*).

Respondent contends this claim was not fully exhausted (ECF No. 32 at 31–32).

Respondent contends in Petitioner's first Rule 3.850 motion, he presented an IATC

claim based only upon counsel's failure to hire an arson investigator and present his

testimony at trial (*id.*).  Respondent contends the state court's adjudication of that

claim was not contrary to or an unreasonable application of clearly established federal

law (*id.*).  Respondent contends the remaining aspects of the claim (i.e., that counsel

failed to ensure that the expert visited the house before it was razed, and that counsel

should have hired a second expert) are unexhausted (*id.*).   Respondent argues

Petitioner cannot show cause for his failure to exhaust, because he presented other

IATC claims regarding the hiring of an expert in his Rule 3.850 motion (*id.*).

Respondent further argues Petitioner cannot show prejudice, because the arson

investigator hired by the defense agreed with the State's expert that Petitioner caused

the fire (*id.*).

In response to the exhaustion argument, Petitioner asserts that the allegations

he presents here are the same allegations he presented to the state court, as evidenced

by his testimony at the post-conviction evidentiary hearing, that he instructed trial

counsel to hire an arson expert to investigate the crime scene (*see* ECF No. 39 at 16).

Petitioner argues that trial counsel's reliance upon the opinion of the investigator they

hired, Mr. Williams, was unreasonable, because Williams' opinion was based upon

conclusions he was not qualified to make (*id.* at 14–20).  Petitioner further argues Mr.

Williams' opinion was based upon his review of the fire scene diagram, photographs,

and SFM's report, but Williams could not properly evaluate this evidence without

having inspected the actual fire scene and 8"x10" color glossy photographs of the

scene (*id.*).  Petitioner additionally contends the state post-conviction court did not

have the benefit of certain evidence (e.g., "arson lab evidence file and

documentation," Detective Barron's "ACISS Reports," and the SFM's policies and procedures) showing that the SFM investigator's reports and exhibits were "manipulated" (*id.*).

The exhaustion requirement is satisfied if a claim is "fairly presented" to the state court that had "an opportunity to apply controlling legal principles to the facts bearing upon [it]." *See* Picard, 404 U.S. at 275, 277; *see also* Kelley v. Sec'y, Dep't of Corr. 377 F.3d 1317, 1344 (11th Cir. 2004) (to exhaust a claim, a petitioner must present the state court with the particular legal basis for relief in addition to the facts supporting the claim). The state court record demonstrates that Petitioner presented the state court with the facts supporting each aspect of the IATC claim he presents here, i.e., that trial counsel was ineffective for failing to secure an expert to examine the fire scene and testify at trial, even though the first expert provided defense counsel with an opinion that was unfavorable to the defense. The state court had an opportunity to address all aspects of Petitioner's claim in the first instance when the court rejected the merits of his IATC claim. Therefore, exhaustion presents no obstacle to this court's review of Petitioner's IATC claim concerning use of a defense expert, including all aspects of that claim presented in the second amended § 2254 petition. Petitioner's having exhausted his IATC claim, he must demonstrate that the

state court's adjudication of the claim was based upon an unreasonable factual determination, or that the adjudication was contrary to or an unreasonable application of clearly established federal law.

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms.  Strickland, 466 U.S. at 688–89, 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to

reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

Professionally competent assistance includes a duty to conduct a reasonable investigation. *See* <u>Strickland</u>, 466 U.S. at 690–91. The Supreme Court has emphasized that only when counsels' choices are made after a "thorough investigation of law and facts relevant to plausible options" are those choices "virtually unchallengeable." *Id*. at 690. When, however, "strategic choices [are] made after less than complete investigation [they] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690–91. Thus, at bottom, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly

assessed for reasonableness in all the circumstances. . . ." *Id.* at 691.  This means that when a court assesses the attorney's decision not to investigate, it "must consider . . . whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'"  Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high.  *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Jones v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S.

at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding.  *Id.* (citation omitted).  And Petitioner must show that the likelihood of a different result is substantial, not just conceivable.  Williamson v. Fla. Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (citing Richter, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Strickland, 466 U.S. at 695.  The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  *Id.* at 694–95.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier

v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar

is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176

L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was

unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788.

As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.
> The Strickland standard is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts must guard against the
> danger of equating unreasonableness under Strickland with
> unreasonableness under § 2254(d).  When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable.  The question
> is whether there is any reasonable argument that counsel satisfied
> Strickland's deferential standard.

Id. (citations omitted).

> 2.      Federal Review of State Court Decision

As Ground 1 of Petitioner's second amended Rule 3.850 motion, Petitioner

claimed that trial counsel was ineffective for failing to retain an expert in arson and

fire investigation to rebut or discredit the State expert's investigation and testimony

(Ex. Y at 299–303).  Petitioner asserted that he had retained Dr. Paul Eason, an expert

in the field of arson investigation and origins or causes of fire (id.).  Petitioner asserted

Dr. Eason was available and willing to testify at Petitioner's trial if Petitioner's trial

counsel had sought his services (*id.*).  Petitioner asserted Dr. Eason would have discredited the State expert's testimony and pointed out deficiencies and omissions in the investigation by State's expert (*id.*).  Petitioner proffered the substance of Dr. Eason's testimony in his Rule 3.850 motion (*id.*).

The state circuit court held an evidentiary hearing on this claim (Ex. AA).  At the hearing, Petitioner testified he retained Attorney William Knight approximately three days after the fire (*id.* at 564).  Petitioner testified that Attorney Knight told him that his $50,000 fee included funds to hire an expert to investigate the fire scene, assist with depositions, and testify at trial (*id.* at 568).  Petitioner testified that as the case progressed, Attorney Knight informed him that he had retained an arson expert named Jeffrey Williams, and that Williams had reviewed the State Fire Marshal investigator's materials and agreed with the investigator's conclusions (*id.* at 568–70).  Petitioner testified that Attorney Knight never suggested that they look for a different expert, and never had an expert investigate the fire scene as Petitioner requested; instead, Attorney Knight told Petitioner that they would proceed without a defense expert (*id.* at 570–71, 574–75).  Petitioner testified that he thought it was strange that Attorney Knight initially told him that a defense expert was important to the defense, but then decided not to use one (*id.* at 570).

Petitioner's post-conviction counsel also presented the testimony of Paul Eason (Ex. AA at 534–61). Dr. Eason testified that he held a doctorate degree and a bachelor's degree in material science and engineering (*id.* at 535). He testified he was also a licensed engineer and a certified fire and explosion investigator (*id.*). Dr. Eason testified he provided expert testimony in both state and federal courts in the areas of fire investigation, fire causation, materials behavior, materials failure analysis, explosions, and industrial accidents (*id.*). Dr. Eason testified that in preparation for his testimony at the evidentiary hearing, he reviewed photographs of the scene, documentation of the fire investigation and the fire incident report, and the trial transcripts (*id.* at 537). He testified that he also spoke with Petitioner (*id.*). Dr. Eason testified that if he had been asked to testify at Petitioner's trial, his observations, analysis, and testimony would be the same as his testimony at the evidentiary hearing, with the exception of information contained in the trial transcripts (*id.* at 538). Dr. Eason testified regarding the significance of a burn pattern:

> The burn pattern manifests in a number of different ways depending on what time [sic] of fire it is. But what it does is it gives the investigator an idea of how the fire progresses from the point of origin through the structure or the facility. So in cases of vertical walls or floors or wood beams, the damage done by the fire or the smoke leaves patterns that can sometimes be traced back to the point of origin.

(Ex. AA at 538).

In questioning Dr. Eason, Petitioner's counsel referenced the following trial

testimony of SFM Detective Barron with respect to Barron's observation of a burn

pattern:

> A.  We had a very large area of origin that was in the, right inside
> the front doorway that extended into the living room area and the fire
> burnt from the front doorway back into the house and out the front
> doorway.
>
> Q.  So in your expert opinion the fire was started at the front
> doorway?
>
> A.  Fire started just inside the front doorway.
>
> Q.  And burned toward the back of the house?
>
> A.  Burned toward the back of the house and out the front door of
> the house.
> . . . .
> A.  In this case our area of origin was in a wide open walk area as
> if you were to walk in the front door it was the actual walkway to the
> back of the house.

(Ex. C at 192–93).  Detective Barron authenticated the photographs he took of the fire

scene (admitted as State's Exhibit FMP1–41) and with the aid of his hand-drawn

diagram (admitted as State's Exhibit D), Barron described where he was standing and

the direction he was looking when he took each photograph (*id.* at 196–211).  With

respect to photographs of the burn pattern, Detective Barron testified that FMP-4 and

FMP-5 were taken standing in front of the house looking at the front doorway, and

showed the fire patterns that went out the front door (*id.* at 200).  Detective Barron

testified that FMP-13 was taken standing in the front doorway looking directly into

the home (*id.* at 203).  Barron testified that the photograph supported his conclusion

that the fire started at the front doorway and traveled to the back:

> A.  If you will look at this stud here, this is like a free standing support post.  This home actually had a loft style space directly above the front doorway that would have went to the second floor of the bedrooms.  We have clean studs at the very back.  We have some type of wood furniture sitting here.  The patterns on the furniture is on the front of it and on the stud the fire patterns are on the front of it, indicating the fire burned from the front to that stud.
>
> Q.  Was there any charring on the back side of that stud?
>
> A.  Not to the point that there was on the front.  It was a deeper char on the front of the, what I was trying to indicate in the photograph.
>
> Q.  Number 14.
>
> A.  That is looking from the front doorway view to the left of the room, which would have been looking into the living room area.
>
> Q.  Anything else in that photograph that supports your opinion about the burn pattern?
>
> A.  No, just the further you get away from the front door the cleaner your studs are.
>
> Q.  Number 15.
>
> A.  This is the same point of view, just looking to the other side of the room which is the kitchen.  Here's the stove.  That's the kitchen area.

Clean studs is what I was trying to photograph that are the same on this side as they were on the other side of the living room.

Q.  What is important about the clean studs there?

A.  It is indicating that we didn't have a heavy fire pattern as far back as we did forward to the one stud that was in the photograph that was totally charred, which was right outside the front door.

. . . .

Q.  26.

Was indicating, 26 is where I collected a sample at the very back of the living room.  I was trying to get the can where I collected the sample and the golf tee where I marked it.  This is at the very, this would have been up in this area.  There is a piece of furniture sitting right under where the stairs would have went up and that's the piece of furniture here that is burned from the front side.

Q.  That was at the back by the base of the stairs basically?

A.  Right.

Q.  27.

A.  Same exact sample, just took a photograph where the tee with the can I collected the sample in and the glove is where I actually collected the sample and removed the glove before I moved onto the next sample, so to not cross contaminate between samples.

Q.  28.

A.  Same picture, closer view.

Q.  And 29

> A.  29 is the sample that was collected, it's Q-1 here just inside the front doorway, indicating the sample and the glove.
>
> Q.  And 41.
>
> A.  Just another view inside the house trying to get a better view of that one stud that was straight inside the front doorway with the heavy char.
>
> Q.  And going back to your—okay.  So if you could just show with the laser pointer on your diagram there the burn pattern that you—
>
> A.  That stud was located right along in this area, it was like a support beam for the second floor and to the wide open floor place.  And the burn patterns with the large area of origin, the most intense fire travel appeared to be from the front door inward.
>
> Q.  So in your opinion the fire started here at the front door and burned to the back?
> . . . .
> THE WITNESS:  Actually I indicated the fire starting just inside the front doorway, extending backwards and then out the front doorway.

(Ex. C at 204–05, 207–08, 211).  Detective Barron admitted on cross-examination that his testimony as to the location of certain items depicted in the photographs was not verified by the photographs themselves, since some of the photos were close-ups, but he testified that he indicated the location of each item in his notes (*see* Ex. C at 215–19).  With regard to the photograph of the stud, Barron admitted that he photographed only the front of the stud but did not photograph its backside (*id.* at 242).

At the post-conviction evidentiary hearing, Petitioner's post-conviction counsel

questioned Dr. Eason regarding Detective Barron's trial testimony as to how certain

photographs demonstrated the burn pattern that Barron observed:

> Q.  In this particular case the State used a fire marshal, and he was
> apparently declared as an expert, the State's investigating office of the
> fire marshal, and he specifically testified that the fire burned from the
> front door and traveled back.  And Judge, that would be in the trial
> transcript at page 192.  And then he testifies the photograph
> demonstrated this burn pattern, because the photographs of the charred
> support post or stud shows a burn pattern indicating the direction the fire
> took.  Can you tell the Court, first of all, what you think of that opinion?
>
> A.  The photographs that were provided did not actually
> demonstrate a burn pattern.  There were two different types of
> photographs involved, one was of the floor area or ground area from the
> front of the house towards the back, and burn pattern that was described
> by the fire marshal was not evident in the photographs.  And that is
> actually what he testified to in court, that it wasn't visible in the
> photographs.  The other piece of burn pattern evidence that he used to
> show that the fire progressed from the front to the back was the vertical
> wood member which was charred.  Unfortunately there's no photograph
> of the side or the backside of that member to show if there's any more or
> less char on the opposite side, thereby making it evidence of char, but
> not a burn pattern.

(Ex. AA at 539–40).  Counsel questioned Dr. Eason regarding one particular

photograph, FMP-13:

> Q.  This is one of the photographs that you reviewed, and I'm
> presuming that the fire marshal would use in his opinion as to the cause
> of the fire and the burn pattern, is that correct?

      A.  This is correct, yes.

. . . .

      Q.  Would you characterize, then, that that statement that the fire marshal made basically talking about cause of the fire in terms of the pattern, was accurate, not accurate, or misleading?

      A.  I would say the evidence is non-evidentiary, it's not conclusive of anything because it's not demonstrative of pattern.  It doesn't actually show a progression of fire.  It is evidence of burn on the vertical member, but without the backside of the stud, the vertical member to show more or less char, we don't know if the fire went one way or the other.

(Ex. AA at 540–41).  Dr. Eason viewed five more photographs and stated the same thing, that none of the photographs actually showed a burn pattern from one part of the house to the other (*id.* at 542–47).  Dr. Eason also testified that, with respect to one particular photograph of a fire debris sample collection can (marked as FMP-29 at trial and exhibit 5 at the post-conviction evidentiary hearing), Detective Barron testified at trial that the photograph depicted the sample collection can near the front door; however, when Eason compared it with a photograph of the collection can at the rear of the living room, it was clear that the sample collection can depicted in FMP-29 was actually at the location at the rear of the living room (*id.* at 543–45).  Dr. Eason testified that Detective Barron was thus incorrect when he testified that FMP-29

supported the conclusion that the fire started at the front door area (*id.*).[8]  Dr. Eason

further testified that, if he had testified at Petitioner's trial, he would have stated that

FMP-29 was not a photograph of the sample collection can at the front door area (*id.*

at 545).

Dr. Eason testified that the location of a melted gas can discovered in the house

by Detective Barron was "a pretty critical piece of evidence" (Ex. AA at 546).

Detective Barron testified that he discovered the melted gas can two to three feet

inside the front doorway, and that photograph FMP-20 was a photograph of the melted

can (*see* Ex. C at 206–07).  Dr. Eason testified that neither the photograph itself nor

any of the other photographs depicted the "context," and thus did not demonstrate

where Detective Barron discovered it:

> [T]here's no context in the photo, there's no farther back photo to
> demonstrate where this actually was, and there's no documentation of
> what's called the protected spot underneath where it was melted.  So
> essentially when you pull a molten gas can off the floor, there should be
> a protected area that was sheltered from the fire.  There's no photo of
> that, and nothing in the prior photo exhibits where this was actually
> taken from.

(Ex. AA at 546).

---

[8] The trial transcript shows that Barron did not actually testify that FMP-29 supported the
conclusion that the fire started at the front door area.

Dr. Eason testified that the same was true of the location of a box of matches

discovered by Detective Barron (*see* Ex. AA at 546–47).  Detective Barron testified

that a firefighter saw the matches in the front yard and alerted him to them (Ex. C at

202–03).  Barron testified that FMP-12 was a photograph of the matches (*id.*).  Dr.

Eason testified:

> This is a photo of a box of matches that is outside, presumably, there's
> grass on the ground.  Unfortunately there is no other photo in context to
> show where this location is.  Typically when you're documenting fire
> evidence, especially something as small as a box of matches, you take
> several photos from farther back documenting the approach towards
> evidence, thus giving context to the location and the orientation of the
> object.  So it's a great photo of a box of matches, but it doesn't show
> where it's from.

(Ex. AA at 546–47).

When asked whether there was anything significant or misleading about

Detective Barron's testimony, or anything that could have been rebutted by a defense

expert, Dr. Eason responded, "No, no, just the lack of reference of location" (Ex. AA

at 547).  When asked whether he would classify Detective Barron's "omissions or his

misstatements" in his testimony as minor, medium, or significant, Dr. Eason testified:

> Well, I think the failure to demonstrate some critical points of
> evidence is significant.  I think there's, you know, when you're on a fire
> scene, there's always little errors that happen, it's a mess, you're
> documenting lots of photos.  But I think when we're talking about some
> significant evidence in this case, the location of where the dog indicated

accelerant by the white golf tees, that was described as the procedure he used.

. . . .

The fire marshal used a fire dog, which is a technique for examining a scene.  When the dog indicates on certain spots, you typically tend to take samples from those spots and send them off to the lab for corroboration of testing through a couple of different techniques.  So when the fire dog indicates on a spot, according to the fire marshal, his procedure was to place a white golf tee at that location, and then come back with the paint cans, take a sample, seal it up and send it off to the lab.  In this case, the photos which are already up there indicate there are paint cans in one location, but no indication of golf tees in that location.  That I believe was labeled as Q1, or the front of the house, where Mr. Reese was standing.  So there's no golf tees present in the location where that sample was taken, despite the fact that that is sort of the crux of the case.  Now, procedural error, I don't know; you know, it's hard to document something like that.  But the golf tee isn't in the photo.  The photo itself was mixed up with another location, which was the back of the house, which is where Mr. Reese is alleging that Ms. Baggett was standing.

. . . .

So in general there were some other bits of evidence, for instance the locations of the matches.  I believe Ms. Baggett's testimony was that she climbed out the back window, but there's no documentation of that window being intact or open, that I have seen.  The other documentation of burn pattern are not demonstrative, meaning the photo, whether the pattern was ever there or not doesn't demonstrate that the pattern is there, therefore it's the only physical record we have.  So yes, I would say it's significant omissions.

(Ex. AA at 547–50).

On cross-examination by the State, Dr. Eason testified that with respect to the

photograph of the front side of a charred beam/stud, even if he (Eason) had viewed the

back of the beam/stud, he would not have been able to provide an opinion as to where the fire started (Ex. AA at 553–54).  However, Eason stated that evidence that the backside was less charred or more charred would demonstrate "where the fire started in mass, and how it progressed through the house" (*id.* at 560–61).  Dr. Eason testified that Detective Barron's photos were "inconclusive" as to where the fire started, and that he (Eason) would need more photos in order to provide an opinion as to where the fire started (*id.* at 554–55).

Counsel for the State also cross-examined Dr. Eason with respect to his testimony that Detective Barron was wrong about the location of the sample collection can shown in FMP-29:

> Q.  So is it your expert opinion this isn't the back, that this is the back of the house, or is that something that any juror could look at that photo and say well, in context this was obviously an oversight?
>
> A.  Well, I think if pointed out that the glove is in a different location, and the absence of a tee, I think anyone who spends enough time looking at the photo could have figured that out.  But without that cue, I don't know that they would have.
>
> Q.  But it was just an oversight, correct?
>
> A.  It could have been, yes, I don't know.

(Ex. AA at 556).

Dr. Eason testified that he did not have an opinion as to who started the fire (Ex. AA at 560).  He stated, "My opinion is that the procedures of the fire marshal and the evidence that were put forth are not demonstrative to prove anything" (*id.*).  Finally, Dr. Eason was asked whether it was common in fire investigations to use photographs as the basis for investigating the cause or attributes of a fire (*id.* at 561).  Dr. Eason testified that in a lot of cases, his investigation is based upon photographs because the actual fire scene is no longer available (*id.*).

Attorney William Knight testified telephonically at the evidentiary hearing (*see* Ex. AA at 577–78, 600).[9]  Knight testified that he hired Jeffrey David Williams with Fire and Accident Causation Technical Services to review the evidence provided to the defense by the State (*id.* at 582).

> Q [by the State]. And after he [Mr. Williams] reviewed everything, what conclusion did he come to?
>
> A.  His conclusion—he did not make a written report.  Indication was that it would not have been to the defense's benefit for him to formulate a written opinion.  And his indication to me was that his review of the materials led to the same conclusion that the law enforcement personnel had had about the start of the fire, and that it would have been, it would not have been to the defense's benefit to present him at trial.

---

[9] Attorney Knight was sworn prior to testifying (*see* Ex. AA at 577–78).

Q.  Do you recall if he was going to be able to testify to who started the fire based on the defendant's injuries?

A.  I do, and his opinion indicated to me was that it was consistent with Mr. Reese being the person, given the physical evidence and his injuries, that it would have been more consistent with Mr. Reese being the one who had started the fire.

(Ex. AA at 582–83).  Attorney Knight testified that he did not talk to any other experts (*id.* at 583).  Knight testified that, based upon "practical matters" and from a "strategic standpoint," they would attack the testimony of SFM Detective Barron's testimony by pointing out inconsistencies, problems, and mistakes with his investigation and conclusions, and by arguing that Barron's testimony was not credible (*id.* at 583–84).

Petitioner's post-conviction counsel questioned Attorney Knight as to why he did not seek another expert's opinion (Ex. AA at 590).  Knight responded that he discussed Mr. Williams' assessment with Petitioner (*id.* at 591–92).  Knight testified that there was no discussion about retaining another expert; instead, it was decided that they would rely on cross-examination to discredit the State's witness who was going to give his opinion about the origin of the fire (*id.*).  Attorney Knight testified that he and Mr. Williams discussed Williams' background and qualifications, and Knight was "perfectly satisfied" with Williams' background and expertise (*id.* at 596).

Knight testified that he did not obtain a curriculum vitae or anything written, because

it could have been counterproductive for Petitioner's defense (*id.* at 596–97).

Attorney Knight testified to the following on redirect:

> Q.  Mr. Knight, when you talked to the expert you had retained, was his initial opinion very strong?

> A.  It was.  It was immediate and definitive in his opinion, it seemed to me.

> Q.  And would that be part of the reason, could that have played into the reason why you did not talk to other experts?

> A.  It was certainly part of that decision, yes.

> Q.  And the implication that the defendant started the fire, could that have played into the fact that you didn't talk to other experts?

> A.  Absolutely.

(Ex. AA at 600).

Carroll McCauley, III, was Attorney Knight's co-counsel (Ex. AA at 601).

With regard to retaining a defense expert, Attorney McCauley testified that Attorney

Knight "took the lead on that" (*id.* at 606).  Attorney McCauley testified that Attorney

Knight told him that the expert he had retained stated that if he testified at trial, he

would have to admit on cross-examination that Petitioner was more likely the person

who started the fire, because he had burns on his hand and legs, and Ms. Baggett did

not have any burns (*id.* at 607).  McCauley testified, "So from talking to Mr. Knight

and discussing that issue, and I believe that was also discussed with Mr. Reese, that

we weren't going to call the expert to testify, because it was too damaging, it was too

risky" (*id.*).  Attorney McCauley testified that Attorney Knight told him that he and

the defense expert discussed the State Fire Marshal investigator's report, and the

expert provided advice on how to challenge the investigator's report and investigation

(*id.*).  Attorney McCauley testified that there was no discussion about retaining

another expert, because he assumed that another expert would give the same opinion

as Mr. Williams (*id.* at 613).  When Petitioner's counsel asked McCauley if he

regretted not consulting with another expert, McCauley responded:

> A. No, I didn't feel like experts in the scientific community would give inconsistent opinions about the major issue of who started the fire. And I expected that the next expert that was talked to would have said that if Mr. Reese had the burns on his hand and his legs, that they would have to admit that he was more likely the person that started the fire.  So I didn't feel like, I didn't regret that decision.

(Ex. AA at 614–17).

In the circuit court's written order denying Petitioner's second amended Rule

3.850 motion, the court correctly identified the two-pronged <u>Strickland</u> standard as the

controlling legal standard (Ex. Z at 397).  The court adjudicated this specific  IATC

claim as follows:

In Ground One, the Defendant alleges that trial counsel was ineffective for failing to retain an arson expert.  The Defendant alleges that the defense theory at trial was that the Defendant's girlfriend and alleged victim in the case, Suzanne Baggett, had started the fire in their shared residence.  The Defendant maintained that the two of them were arguing while inside the home, when Ms. Baggett poured gasoline on the floor and lit a match to ignite the fire.  The evidence was not in dispute as to the two of them arguing, their respective locations in the living room (the Defendant was standing just inside the front door, while Ms. Baggett was standing in the rear of the living room), and how the fire was started.  The main issue in dispute was who poured the gasoline and lit the match.

The Defendant's theory that Ms. Baggett had started the fire was bolstered by his claim that law enforcement did not adequately investigate the fire due to Ms. Baggett's connection with law enforcement.  According to the Defendant, Ms. Baggett's ex-husband is related to the investigating officer [Investigator Daffin].  Further, the officer was sympathetic to Ms. Baggett, who lost her son in an unrelated accident.  Thus, the Defendant argued that law enforcement did not fully investigate the fire due to bias and sympathy toward Ms. Baggett.

At trial, defense counsel failed to call any expert to rebut the State's expert, Tommy Barron, who was the fire marshal that investigated the scene.  The Defendant asserts that his attorneys knew that the State's expert would testify that the Defendant started the fire.  They failed to retain an expert to rebut this testimony, and simply called the Defendant to contradict the fire marshal.  The Defendant asserts that Dr. Paul Eason was available to testify at trial and could have discredited the State's expert and pointed out deficiencies and omissions in the investigation.  Dr. Eason would have rebutted the State's expert with respect to the burn pattern (or lack thereof), the significance of the melted gasoline can and its location in the room, the discrepancies involving the accelerant map and accompanying photographs, and other general problems with the investigation.  The Defendant argues that, without an expert to point out the substandard investigation and

inaccurate testimony of the State's expert, he was prejudiced because the case was otherwise a "swearing match" between him and Ms. Baggett. Because the State's expert was not discredited, the Defendant asserts that he was left with no effective defense.

The Florida Supreme Court has addressed several factors for the courts to consider when making a determination about whether counsel was ineffective for failing to call an expert witness. The court provided:

> First among these are the attorney's reasons for performing in an allegedly deficient manner, including consideration of the attorney's tactical decisions. A second factor is whether cross-examination of the State's expert brings out the expert's weaknesses and whether those weaknesses are argued to the jury. The final factor is whether a defendant can show that an expert was available at the time of trial to rebut the State's expert.

*State v. Riechmann*, 777 So. 2d 342, 354 (Fla. 2000) (internal citations omitted). The court has also held that a failure to call a defense expert witness to rebut the testimony of the State's expert witness is not ineffective assistance when counsel can vigorously cross-examine the State's expert to establish the facts necessary for the defense. *See Reed v. State*, 875 So. 2d 415, 427 (Fla. 2004). "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense" because "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Crain v. State*, 78 So. 3d 1025, 1040 (Fla. 2011) (quoting *Harrington v. Richter*, 131 S.Ct. 770, 791 (2011)).

Regarding the first factor, trial counsel for the Defendant testified at the evidentiary hearing that the defense did, in fact, secure an expert witness for the purposes of their own investigation. At the evidentiary hearing, William Knight, co-counsel for the Defendant, was called as a State witness. Mr. Knight was hired by Mr. Reese, but later brought

Case 5:16-cv-00010-MW-EMT Document 40 Filed 06/19/18 Page 71 of 121

Carroll McCauley into the case as co-counsel. Mr. Knight testified that he hired Jeffery David Williams of Fire and Accident Causation Technical Services. Counsel said that there was no physical evidence left from the fire, but the expert had reviewed all of the pictures and reports that the defense had been given during discovery. After his review, the expert's conclusion was that he agreed with the State's expert opinion that the Defendant started the fire. Furthermore, the expert indicated that he should not write a written report, since it would be detrimental to the defense's case. The defense determined not to seek another expert's opinion based on Mr. William's [sic] conclusions, and instead made a strategic decision to attack the conclusions and credentials of the State's expert. They determined that some of the fire marshal's conclusions were inconsistent and that he had made errors during his investigation. In addition, the State's "expert" was simply a law enforcement officer and not a fire causation expert. Mr. McCauley also testified concerning his and Mr. Knight's strategic decision not to call Mr. Williams. He noted that Mr. Knight went over the investigative report with Mr. Williams to get some pointers on how to proceed during cross-examination of the State's expert. Thus, the attorneys for the Defendant planned to discredit this expert rather than attempt to find an expert that would testify favorably for the defense. Mr. Knight even testified that the Defendant provided the funds for securing this expert and a discussion took place concerning the expert's unfavorable opinion. Counsel testified that it was decided strategically that they would not rely on their own expert based on the above facts.

With respect to the second factor, the record indicates that defense counsel vigorously cross-examined the State's expert witness, Tommy Barron, and also argued to the jury the various problems with this witness's testimony in closing arguments. (Tr. at 215–242; 311–324.) Specifically, defense counsel pointed out that there was no photograph indicating the actual location of the gas can in relation to the rest of the living room (tr. at 216–217), there was no photograph of the location where the matches were found (tr. at 217–19), the lack of fingerprint or DNA evidence taken from the matchbox or the gas can top (tr. at 221–23, 229–30), and the detective's illogical numbering of the samples

Case No.: 5:16cv10/WTH/EMT

taken from the scene (tr. at 237–39). In addition, counsel highlighted that the detective did not have any specialized degree in science or any college degree at all. (Tr. at 219.) Further, counsel elicited testimony that indicated the detective may have been influenced by the victim's story prior to conducting his investigation, and also that he may have felt sympathy for her based on Officer Daffin informing him about the victim's son's death. (Tr. at 219–20, 237, 240–41). The cross-examination similarly discredited the victim's statements made to law enforcement, specifically her claim that there was an explosion that caused a door to blow off the hinges. (Tr. at 227–28). Most importantly, defense counsel was able to elicit testimony that the origin of the fire could have been from multiple points in the living room. (Tr. at 231.) When the detective attempted to explain his conclusion that the fire had started near the front entryway, defense counsel further impeached him with his testimony from a deposition in which the detective stated that the fire began in Q-1, which was where the victim was allegedly standing, and moved toward the front door along the floor. (Tr. at 233–34.) Moreover, the detective admitted that the photographs did not show the burn pattern to which he had testified (tr. at 234), and further admitted that he had not taken a picture of the back of the stud that had fire damage on the front of it (tr. at 242). In closing argument, counsel again highlighted all of the inconsistencies in Detective Barron's testimony and the mistakes made during the investigation. (Tr. at 311–12, 315–319, 322–24).

The final factor for the court's consideration relates to the Defendant's ability to show that an expert was available to testify at trial to rebut the State's expert. In this case, the Defendant presented Dr. Paul Eason, an expert in arson investigations with a doctorate in material science and engineering. He is also a certified fire and explosion investigator. Dr. Eason testified at the evidentiary hearing that he had been called as an expert in fire investigation and causation in cases prior to the Defendant's trial. The primary challenge by Dr. Eason to the detective's testimony was that the pictures used to support his opinion were "non-evidentiary," in that no observable burn pattern was revealed. He noted that the detective had relied on a vertical wood member (or

stud) in the living room that was charred to prove that the fire burned from the front of the house to the back.  However, Dr. Eason testified that the photograph did not indicate any burn pattern, since there was no picture of the sides or back of the wood member to show if there is any more or less char.  Thus, in Dr. Eason's opinion, the detective's opinion was not supported by the forensic or visual evidence that he was able to review.    Nevertheless, he did indicate that Detective Barron had acknowledged that the pattern was not observable from the photographs. Dr. Eason also pointed out many of the discrepancies that trial counsel brought out during cross-examination, including the failure of the detective to take photographs of the gas can and the matches in their position relative to the rest of the scene, the detective's testimony that indicated that the fire actually started where the victim was alleged to have been standing, and the overall poor investigative techniques used by the detective.  However, Dr. Eason admitted that he had never been to the actual crime scene and was relying purely on the photographs.  In addition, he acknowledged that the detective had testified to certain findings, including the absence of charring on the back of the stud in the house, which may have supported his conclusions but were simply not indicated in the pictures.  Further, he admitted that he had no opinion regarding who may have started the fire, and only disputed the detective's procedures and the evidence presented at trial to prove the cause of the fire.

While the Defendant put forth an expert at the evidentiary hearing that could have challenged the methodologies and visual evidence used by the detective in coming to his expert opinion, Dr. Eason admitted that he was never at the crime scene and would have needed to see more of the scene in order to make a conclusion regarding the origin of the fire. However, Detective Barron went to the actual scene and testified to his observations and provided some visual evidence regarding his findings. While his methodologies and conclusions were challenged by Dr. Eason, the Defendant has not demonstrated that Dr. Eason could have challenged the detective's testimony more effectively than defense counsel did on cross-examination.  In fact, defense counsel highlighted most, if not all, of the errors and inconsistencies in the detective's

investigation to which Dr. Eason also testified.   In addition to challenging the quality of the investigation, defense counsel was also able to elicit testimony from the detective that indicated a potential bias towards the victim.  Based on the unfavorable report that defense counsel received by Mr. Williams, in addition to the numerous and easily highlighted mistakes made during the investigation, this Court cannot find that defense counsel was ineffective for make a strategic decision to cross-examine the State's expert in lieu of calling its own expert witness. *Brown v. State*, 894 So. 2d 137, 147 (Fla. 2004) ("Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

Furthermore, the Defendant has not demonstrated the requisite prejudice necessary under *Strickland*.  Even if Dr. Eason had been called at trial, this witness's testimony would not have conclusively established that Ms. Baggett had started the fire.  Dr. Eason even unequivocally stated during the evidentiary hearing that he had no opinion regarding who started the fire.  As stated above, Dr. Eason primarily challenged the detective's conclusions on the basis of the photographs not being demonstrative of any burn pattern, specifically since they did not indicate a "char gradient."  However, the detective was present at the arson scene and provided additional testimony concerning his personal observations, including that there was not extensive charring to the back of the stud to further support his opinion that the fire had started at the front of the home.  (Tr. at 204–05.)  Additionally, the investigatory problems pointed out by Dr. Eason were similarly brought out during cross-examination of the detective.  Thus, there is not a reasonable probability that, had defense counsel called Dr. Eason as an expert witness, the outcome of the trial would have been different.

(Ex. Z at 397–401).  The First DCA affirmed the decision without written opinion (Ex.

EE).

As an initial matter, the court rejects Petitioner's contention that the state court's adjudication of the IATC claim is not entitled to deference because the court did not have the benefit of considering certain evidence which Petitioner asks that this federal court consider.  Because Petitioner's claim was adjudicated on the merits in state court, review under § 2254(d)(1) is limited to the record that was before the state court.  *See* Cullen v. Pinholster, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011).  "If a claim has been adjudicated on the merits by a state court, a federal habeas petition[er] must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  563 U.S. at 185 (footnote omitted).  Likewise, review of a claim under § 2254(d)(2) is specifically limited to "evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Thus, as a general rule, district courts may not expand the record or conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d).  *See* Frazier v. Bouchard, 661 F.3d 519, 528 (11th Cir. 2011) (limiting review under § 2254(d)(1) to record before state court, and refusing to consider expanded record presented to district court).[10]

---

[10] Although federal habeas courts may take new evidence in an evidentiary hearing, § 2254(e)(2) imposes a limitation on the discretion of the federal courts.  *See* Pinholster, 563 U.S. at 184–86.  That statute provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant

The sole issue for this court is whether the state court's adjudication of Petitioner's IATC claim was based upon an unreasonable determination of fact, or contrary to or an unreasonable application of <u>Strickland</u>.

With respect to the state court's factual determinations, Petitioner has not identified clear and convincing evidence <u>in the state court record</u> which demonstrates that any factual determination was unreasonable.  Therefore, Petitioner has not satisfied § 2254(d)(2).

---

shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

> (A) the claim relies on—

>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; <u>and</u>

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e) (emphasis added).  Here, the state court provided Petitioner an opportunity to fully develop the factual basis for his IATC claim by providing an evidentiary hearing.  The factual predicate of Petitioner's IATC claim, as well as <u>all</u> of the evidence Petitioner asks this federal court to consider, could have been discovered by Petitioner's post-conviction counsel through the exercise of due diligence.

With respect to § 2254(d)(1), it is evident that the state court engaged in a straightforward application of the correct rule of law, i.e., the <u>Strickland</u> standard, in analyzing Petitioner's IATC claim.  Petitioner has not demonstrated that the state court mischaracterized or deviated from that standard; nor has Petitioner demonstrated that the state court's result contradicted the result of a Supreme Court case on the same record.  Therefore, Petitioner has not shown that the state court's adjudication was "contrary to" Supreme Court precedent, for purposes of § 2254(d)(1).

Petitioner also failed to satisfy the "unreasonable application" prong.  It was reasonable for Attorney Knight to rely upon his retained expert, Mr. Williams, to tell him if he needed more information or materials (for example, an on-site visit of the fire scene or photographs in a different format) in order to form an opinion as to where the fire originated.  There is no evidence in the state court record that Mr. Williams indicated to Attorney Knight that the information and materials he was provided were insufficient to form an opinion.  Notably, Dr. Eason (the expert who testified for the defense at the Rule 3.850 hearing) testified that his investigation and analysis are commonly based solely upon photographs. Petitioner failed to show deficient performance with respect to Attorney Knight's failure to ensure that a defense expert visited the fire scene before the house was razed.

With respect to Petitioner's claim that counsel was ineffective for failing to retain and present testimony of a second expert, the state court reasonably concluded that defense counsel made a reasonable strategic decision to challenge the state fire marshal's investigation and opinion through cross-examination instead of expert testimony.  The first retained defense expert, Mr. Williams, provided counsel with his opinion that he agreed with the state fire marshal's opinion that the fire originated near the front doorway, where Petitioner admitted he was standing.  There is no evidence that either Attorney Knight or Attorney McCauley had any reason to believe that a second expert would reach a different conclusion than Mr. Williams.

Additionally, defense counsel was able to present the jury with information that cast doubt on the adequacy of Detective Barron's investigation and the credibility of his opinion, through cross-examination of Detective Barron.  For example, it was evident from Barron's own testimony that he misspoke when he described the sample collection can location shown in FMP-29.  Detective Barron testified that FMP-29 showed "the sample that was collected, it's Q-1 here just inside the front doorway . . ." (Ex. C at 208), but Barron's diagram showed that the sample collection site "just inside the front doorway" was actually Q-2, and that Q-1 was at the rear of the living room.

Further, through Attorney Knight's rigorous cross-examination of Detective Barron, defense counsel was able to highlight the errors and inconsistencies in Detective Barron's investigation which Dr. Eason identified at the post-conviction evidentiary hearing.  For example, Attorney Knight pointed out: (1) that there was no photograph indicating the actual location of the gas can in relation to the rest of the living room; (2) that there was no photograph of the location where the matches were found; (3) that there was no fingerprint or DNA evidence taken from the matchbox or the gas can; and (4) that Detective Barron's numbering of the samples taken from the scene was illogical (i.e., Barron testified that the canine first alerted just inside the front door, but Barron numbered that sample collection site Q-2, instead of Q-1) (Ex. C at 216–19, 221–23, 229–30, 237–39).  In addition, Attorney Knight questioned Detective Barron's qualifications by eliciting his admission that he did not have a specialized degree in any type of science or a college degree at all (*id.* at 219).

Attorney Knight also elicited testimony indicating that Detective Barron may have been influenced by Suzanne Baggett's story prior to conducting his investigation, and also that Barron may have felt sympathy for Baggett based upon his learning that her son had died (Ex. C at 219–20, 237, 240–41).  Through defense counsel's cross-examination of Detective Barron, counsel also discredited Ms. Baggett's statement to

law enforcement that there was an explosion that caused a door to blow off the hinges (*id.* at 227–28).

Most importantly, Attorney Knight elicited Detective Barron's admission that the origin of the fire could have been from multiple points in the living room (Ex. C at 231). When Detective Barron attempted to explain his conclusion that the fire had started near the front doorway, Attorney Knight impeached him with his deposition testimony, in which Detective Barron stated that the point of origin of the fire was "from Q-1 [where Ms. Baggett was allegedly standing] up to the front door along the floor" (*id.* at 233–34).[11] Attorney Knight even elicited Detective Barron's admission that his photographs did not show the burn pattern to which he had testified, including the fact that he had photographed only one side of the beam/stud (*id.* at 234, 242). The state court reasonably concluded that Petitioner failed to demonstrate that an expert could have challenged Detective Barron's testimony more effectively than defense counsel did on cross-examination.

---

[11] On re-direct examination by the prosecutor, Detective Barron explained:

> What I was trying to indicate, I had a large area of origin that I felt went from Q-1 to Q-2, which is evident with the flammable liquid burn pattern that I found. The initiation of the fire, the hottest point that burned into the house started back near the front door where I found the gas can. That was the highest concentration of fuel and it burned inward, igniting the other fuel.

(Ex. C at 241).

Here, the state post-conviction court considered the record as a whole, including the trial transcript and the evidence presented at the evidentiary hearing, which showed that Petitioner's trial counsel retained an expert, considered the expert's conclusions after his investigation, and utilized the expert's expertise in developing a strategy to cross-examine the State Fire Marshal detective's testimony at trial. Based upon the record, the state court concluded that defense counsel's conduct was a reasoned strategic judgment. This conclusion was not an unreasonable application of Supreme Court precedent. *See* Butts v. GDCP Warden, 850 F.3d 1201, 1246 (11th Cir. 2017).

The state court also reasonably concluded that Petitioner failed to demonstrate he was prejudiced by defense counsel's alleged errors with respect to retaining, and presenting testimony from, an expert. As the state court noted, Dr. Eason testified that he did not have an opinion as to who started the fire, and that the only opinion he formed was that the fire marshal's procedures and photographs were insufficient to prove anything. But as discussed extensively, the problems with Detective Barron's investigation and photographs were pointed out by defense counsel on cross-examination. Further, Petitioner failed to show that a defense expert could have discredited Detective Barron's personal observations of the fire scene, which—Barron

testified—are what formed the basis of his opinion as to the burn pattern of the fire.

Moreover, equally if not more damaging to the defense, was the testimony of Deputy Jones, who stated that Petitioner told him at the scene that the fire started in the garage as a result of his smoking a cigarette next to propane tanks (Ex. C at 131–34).  Petitioner's statement to Deputy Jones contradicted Petitioner's trial testimony, that Ms. Baggett started the fire in the living room (Ex. D at 261–63, 277–78).

Petitioner failed to demonstrate that the state court's adjudication of his IATC claim with respect to counsel's retention and use of an arson expert was based upon an unreasonable determination of the facts, or that the adjudication was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled to federal habeas relief on this claim.

> 2.    <u>"Counsel was ineffective for not hiring a medical expert to explain Reese's burns and the lack of burns on the alleged victim."</u>

Petitioner alleges Attorneys Knight and McCauley were incompetent for not hiring a forensic arson expert with medical knowledge (ECF No. 20 at 37–38). Petitioner alleges a forensic arson investigator has knowledge of how a fire spreads, but an arson investigator with medical knowledge could have testified to the

following, which would have explained how the burns on Petitioner's shins and feet

showed that he did not set the fire:

> A fire expands from its point of origin in a "V" pattern, with the origin being at the small lower end of the "V", expanding wider as it travels. Reese's burns show the fire was expanding toward him and away from Baggett. Baggett testified Reese lit the match and turned, walking out the door. Baggett's narrative also contradicts the location of Reese's burns.
>
> Baggett herself had no burns. That fact shows she was at the lower end of the "V", the origin of the fire, with the fire moving away from her, and toward Reese. Baggett stated Reese lit the match with his arm extended about 1 ½ feet above the floor. If this were true, Reese would have burns on his hand, arm, face, etc., because of the gas fumes catching fire as they rose from the floor. But he had no such burns.

(ECF No. 20 at 37–38).

Respondent contends Petitioner never presented this IATC claim to the state

courts; therefore, it is unexhausted (*see* ECF No. 32 at 32). Respondent contends

Petitioner cannot show cause for his failure to present the issue, considering that he

filed three Rule 3.850 motions in state court and failed to present this issue in any of

them (*id.*). Respondent additionally contends Petitioner cannot show prejudice (*id.*).

Respondent argues that at the evidentiary hearing on Petitioner's first Rule 3.850

motion, Attorney Knight testified that the arson expert he retained, Mr. Williams,

indicated that Petitioner's burns were more consistent with him being the person who

started the fire (*id.* at 32–33).   Similarly, Attorney McCauley testified that Mr.

Williams' opinion regarding Petitioner's burns led him to conclude that the risk of

hiring another expert, who might have come to the same conclusion, outweighed any

benefit (*id.* at 33).

In Petitioner's reply, he does not dispute Respondent's exhaustion argument.

Petitioner acknowledges counsel's testimony at the post-conviction evidentiary

hearing, but argues that counsel's reliance upon Mr. Williams' opinion was

unreasonable, because Williams was not qualified to give an expert opinion as to

whether Petitioner's injuries were consistent with him being the person who started

the fire (ECF No. 39 at 14–15).   Petitioner contends Mr. Williams' lack of expertise

on this issue is evidenced by the fact that Dr. Eason's qualifications were "far

superior" to Williams' qualifications, and Dr. Eason testified at the evidentiary

hearing that he was not qualified to testify about the burns on Petitioner's body (*id.*

at 15).

Notwithstanding Petitioner's failure to exhaust this IATC claim, Petitioner has

not demonstrated he is entitled to relief on his IATC claim.   *See* 28 U.S.C.

§ 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the

merits, notwithstanding the failure of the applicant to exhaust the remedies available

in the courts of the State.").  Petitioner has proffered no more than a speculative

assertion that a forensic arson expert with medical knowledge could have testified that

the burns on Petitioner's body indicated that he did not set the fire.  In the absence of

a proffered report of such an expert, or, specifically, evidence that an expert's report

would reveal that Petitioner's burns and the lack of burns on Ms. Baggett indicated

that Petitioner did not start the fire, Petitioner failed to demonstrate he was prejudiced

by defense counsel's alleged error.  *See* Price v. Allen, 679 F.3d 1315, 1325 (11th Cir.

2012) (upon de novo review of petitioner's claim that counsel was ineffective for

failing to retain a mental health expert, petitioner failed to satisfy Strickland's

prejudice prong, where petitioner offered no more than a conclusory assertion that a

mental health expert could have testified to a connection between the abuse petitioner

suffered as a child and his subsequent actions).

>    3.    "Counsel was ineffective for not obtaining *before* trial the State
>    Fire Marshall [sic] (and other) reports, photos, diagrams, etc., generated
>    by the State."

Petitioner alleges defense counsel was ineffective for failing to obtain State Fire

Marshal Detective Barron's reports, diagram, 8"x10" glossy color photographs

(including the photo of the three labeled collection cans), and a copy of the State Fire

Marshal's standard operating procedures (ECF No. 20 at 38).[12]  Petitioner contends defense counsel deprived him of his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial (*id.*).

Respondent contends Petitioner never presented this IATC claim to the state courts; therefore, it is unexhausted (*see* ECF No. 32 at 33).  Respondent contends Petitioner cannot show cause for his failure to present the issue, considering that he filed three Rule 3.850 motions in state court and failed to present the issue in any of them (*id.*).  Respondent additionally contends Petitioner cannot show prejudice (*id.* at 33–34).  Respondent argues that the state court record shows that on January 25, 2007, Attorney Knight file a motion to continue the trial date based on a hand delivery of more than 100 pages of additional discovery from the State (*see* Ex. A at 102–04).  Respondent asserts that among the items listed as recently provided by the State were photographs and the fire investigation report, in addition to insurance company notes, memoranda, correspondence, and documents related to an insurance settlement with Ms. Baggett (ECF No. 32 at 34).  Respondent states the trial court granted the motion for continuance (*id.*).

---

[12] Petitioner also contends the State committed a <u>Brady</u> and <u>Giglio</u> violation by not providing these materials in the pre-trial discovery process (*see* ECF No. 20 at 38), but those claims were discussed and rejected *supra*.

Respondent additionally argues that at the evidentiary hearing on Petitioner's first Rule 3.850 motion, Attorney Knight testified that the arson expert he retained, Mr. Williams, based his assessment of the case on the reports and photographs provided to the defense by the State (ECF No. 32 at 34).  Respondent argues that implicit in that testimony was the fact that, contrary to Petitioner's argument, the defense was provided with the Fire Marshal's report, photos, and other documents prior to trial (*id.*).

In Petitioner's reply, he does not dispute Respondent's exhaustion argument; instead, he simply repeats his arguments as to the merits of his IATC claim  (ECF No. 39 at 21).

Notwithstanding Petitioner's failure to exhaust this IATC claim, Petitioner failed to show he is entitled to relief.  With respect to the State Fire Marshal's investigative materials, it is evident that Attorney Knight requested those materials from the State over a year prior to trial, as evidenced by the prosecutor's reference to Knight's request during a pre-trial hearing on January 4, 2006 (*see* Ex. F).[13]  At another pre-trial hearing on September 6, 2006, Attorney McCauley advised the court that discovery was complete, thus indicating that the State had provided the SFM's

---

[13] Petitioner's trial was on April 24 and 25, 2007 (*see* Exs. C, D).

Case No.:  5:16cv10/WTH/EMT

investigative materials, which included the reports, diagram, and photographs (*see* Ex. K). Although the prosecutor subsequently provided the defense with additional discovery, which was the subject of the motion to continue filed on January 25, 2007, the motion to continue stated that the additional discovery included photographs and a fire investigation report from an investigation conducted by a fire expert hired by the insurance company which carried a casualty policy for the house, not the State Fire Marshal's investigation (*see* Ex. A at 102–04). The court granted the continuance and defense counsel reviewed the additional discovery and took additional depositions (*see* Ex. P).

Further, it is evident from Attorney Knight's cross-examination of SFM Detective Barron at trial, and Attorney Knight's testimony during the post-conviction evidentiary hearing, that Attorney Knight had possession of Detective Barron's reports, diagram, and photographs (albeit in 3"x5" black and white format) prior to trial (*see* Ex. C at 215–41; Ex. AA at 582). It is also evident that Attorney Knight provided these materials to the expert he had retained to provide an opinion as to the cause of the fire (*see* Ex. AA at 582). There is no indication that the defense expert indicated to Attorney Knight that he required additional materials, or materials in a different format, in order to render an opinion as to the cause of the fire; and it was

reasonable for Attorney Knight to rely on his expert in this regard.  Therefore, Petitioner failed to show that Attorney Knight performed deficiently with respect to the alleged failure to obtain additional SFM investigative materials during discovery.

With respect to the SFM lab photo of the three labeled collection cans containing the fire debris samples collected by Detective Barron, Petitioner failed to demonstrate he suffered prejudice as a result of defense counsel's alleged failure to request this photo.  The prejudice showing for a Strickland claim is the same as that required for a Brady claim.  *See* Brown v. Head, 272 F.3d 1308, 1316 (11th Cir. 2001).  The undersigned concluded, in the previous discussion of Petitioner's Brady claim, that there is no reasonably probability the jury would have acquitted Petitioner if the defense had been provided a copy of the photo of the labeled collection cans.  Therefore, Petitioner is not entitled to federal habeas relief on this IATC claim.

        4.      "Counsel was ineffective for failing to file a pre-trial *Daubert* challenge to the faulty investigation of the fire scene."

Petitioner contends defense counsel was ineffective for failing to challenge the admissibility of SFM Detective Barron's reports and testimony under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), on the ground that they were not based upon a reliable factual foundation (ECF No. 20 at 42–43; ECF No. 39 at 22).  Petitioner contends a court should conduct a Daubert hearing when the challenging

party's motion for a <u>Daubert</u> hearing is supported by conflicting literature and expert testimony (ECF No. 20 at 42–43). Petitioner alleges a defense forensic arson expert who examined the fire scene could have provided the basis of conflicting expert testimony for a <u>Daubert</u> hearing (*id.* at 32).

Respondent contends Petitioner never presented this IATC claim to the state courts; therefore, it is unexhausted (*see* ECF No. 32 at 35). Respondent contends Petitioner cannot show cause for his failure to present the issue, considering that he filed three Rule 3.850 motions in state court and failed to present the issue in any of them (*id.*). Respondent additionally contends Petitioner cannot show prejudice (*id.* at 35–36). Respondent argues defense counsel was able to impeach Detective Barron by questioning him about the way he performed his investigation (*id.* at 36). Respondent contends there is no evidence in the record to suggest that Barron's theory or technique was anything unusual or untested or not generally accepted in the scientific community (*id.*). Therefore, even if defense counsel had made a pre-trial <u>Daubert</u> challenge, it would not have been successful (*id.*).

In Petitioner's reply, he does not dispute Respondent's exhaustion argument; instead, he simply repeats his arguments as to the merits of his IATC claim (ECF No. 39 at 22).

Notwithstanding Petitioner's failure to exhaust this IATC claim, Petitioner

failed to show he is entitled to relief.  Under <u>Daubert</u>, federal district courts are

compelled to act as "gatekeepers" to ensure the reliability and relevancy of expert

testimony.  <u>Daubert</u>, 509 U.S. at 589, 113 S. Ct. 2786, 125 L. Ed. 2d (1993).  Under

<u>Daubert</u>, expert testimony is reliable and relevant—and, therefore, admissible—when

the following criteria are met:  (1) the expert is sufficiently qualified to testify about

the matters he intends to address; (2) the methodology used is "sufficiently reliable

as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony

assists the trier of fact, through the application of scientific, technical, or specialized

expertise, to understand the evidence or to determine a fact in issue."  *Id.*  These

criteria are "distinct concepts that courts and litigants must take care not to conflate,

. . ."  <u>Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.</u>, 326 F.3d 1333, 1341 (11th

Cir. 2003).

The Florida Legislature did not adopt the <u>Daubert</u> standard until July 1, 2013.

*See* 2013 Fla. Sess. Law Serv. Ch. 2013-107, § 1 (eff. July 1, 2013); *see also*

<u>Anderson v. State</u>, 220 F.3d 1133, 1151 (Fla. 2017).  Petitioner's trial was in 2007.

Petitioner's counsel cannot be deemed deficient for failing to argue that Detective

Barron's expert testimony was inadmissible under a legal standard that was inapplicable at that time.

Additionally, Petitioner failed to demonstrate that defense counsel was ineffective for failing to challenge the admissibility of Detective Barron's expert testimony under the standard that was applied by the Florida courts at the time of Petitioner's trial.  In 2007, Florida courts applied the standard set forth in Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).  *See* Anderson, 220 So. 3d at 1145. Under the Frye test, the principle, theory, or methodology on which the opinion evidence is based must have been scientifically valid, and the procedures followed to apply the technique or process must have been generally accepted in the relevant scientific community.  *See* Anderson, 220 So. 3d at 1145.  A Frye hearing was utilized in Florida "only when the science at issue was new or novel."  *See id.* at 1146 (internal quotation marks and citation omitted).

Petitioner's theory of defense was that the fire originated at the rear of the living room, closer to where Suzanne Baggett was standing than where Petitioner was standing.  The State's expert, SFM Detective Barron, included the rear of the living room in his investigation.  Defense counsel provided Detective Barron's investigative materials to an arson expert, Mr. Williams, and received the expert's opinion.  Mr.

Williams indicated to defense counsel that he agreed with Detective Barron's opinion as to the cause and origin of the fire.  Although Mr. Williams provided defense counsel with advice concerning areas of cross-examination with respect to Detective Barron's testimony, Petitioner has not shown that Mr. Williams indicated to defense counsel that the principle, theory, or methodology on which Detective Barron's expert opinion was based was not scientifically valid, or that the procedures followed by Barron were not generally accepted in the relevant scientific community.  Nor has Petitioner shown that it was apparent from Detective Barron's investigative materials that Barron's opinion was not based on a reliable factual foundation.

Petitioner failed to demonstrate that defense counsel's failure to challenge the admissibility of Detective Barron's expert testimony constituted deficient performance.  Petitioner also failed to show a reasonable probability that the trial court would have properly excluded Detective Barron's testimony under either <u>Daubert</u> or <u>Frye</u>.  Therefore, Petitioner is not entitled to federal habeas relief on this IATC claim.

5. <u>"Counsel was ineffective for failing to object to improper closing argument by the prosecutor about the State's arson expert."</u>

Petitioner contends defense counsel was ineffective for failing to object to two comments by the prosecutor during closing arguments (*see* ECF No. 20 at 43–47). Petitioner alleges the first improper comment was made during the prosecutor's

rebuttal closing argument, when the prosecutor improperly referred to Petitioner's <u>not</u> having a fire expert (*id.*).  Petitioner contends this emphasized that while the State had Detective Barron testify regarding his investigation and conclusion, the defense had no such expert testify, which constituted impermissible burden-shifting (*id.*). Petitioner also argues that the prosecutor's comment constituted improper witness-bolstering, which created "a false premise" and harmful speculation by the jury (e.g., because the State's expert was not countered with a defense expert, the State's expert was more believable, or the facts were such that the defense could not contradict them) (*id.*).  Petitioner alleges defense counsel objected to this comment, but the objection was not made contemporaneously, and the trial court ruled that counsel waived any objection because it was untimely (*id.*).  Petitioner contends defense counsel was ineffective for failing to make a contemporaneous objection (*id.*).

Petitioner alleges the second objectionable comment was also made during the prosecutor's rebuttal when the prosecutor commented, "at the end of the day after he [Sheriff's Investigator Daffin] talked with [State Fire Marshal] Investigator Barron, who did he charge?  So apparently he resolved what didn't make sense to the point that where [sic] he was prepared to charge the defendant with arson and cruelty to animals." (ECF No. 20 at 45–47).  Petitioner contends the prosecutor's comment

equated charges with guilt (*id.*).  He contends this comment defied the presumption

of innocence; constituted improper witness-bolstering, because it placed the prestige

of the Government behind Detective Barron by making an explicit assurance of his

veracity; and invaded the province of the jury to find as fact who set the fire (*id.*).  As

with the first comment, Petitioner alleges defense counsel objected to this comment,

but the objection was not made contemporaneously, and the trial court ruled that

counsel waived any objection because it was untimely (*id.*).  Petitioner contends

defense counsel was ineffective for failing to make a contemporaneous objection (*id.*).


With respect to both comments, Petitioner contends he was prejudiced by

counsel's failure to timely object, because the jury was not properly instructed on (1)

his having no burden to present a defense arson expert, and (2) the mere bringing of

charges does not equate to guilt (ECF No. 20 at 47).  Petitioner also contends

counsel's failure to timely object rendered the issue waived for purposes of direct

appeal (*id.* at 45–47).

Respondent concedes that Petitioner presented this IATC claim in his Rule

3.850 motion (*see* ECF No. 32 at 36).  Respondent contends the state court's

adjudication of the claim was not an unreasonable application of <u>Strickland</u> (*id.* at 36–39).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 2(d) of his first Rule 3.850 motion (Ex. Y at 306–07).  The state circuit court held an evidentiary hearing on this claim (Ex. AA).  Attorney Knight testified as follows with respect to this claim:

> Q [by the State].  Do you recall Mr. Graham, who was the prosecutor on the case, when he gave his second close, do you recall him making statements about the fact that there was only, the facts only spoke to one expert being called?
>
> A.  I have not reviewed the record, but it appears that that was, in reading the, these preliminary, the motion by Mr. Reese's counsel, it appears that that was objected to.  Their position, from my understanding, is that it wasn't an immediate objection, but nonetheless apparently the record showed that I had objected to that.  And so, but from a—if I can just add this—sometimes from a strategic standpoint or tactical standpoint I elect not to make an immediate objection in closing argument because sometimes it can create or draw even more attention to the improper statement, if it's deemed to be that way.  And if it really rises to the level of fundamental error, it can be preserved and argued even without objection, if I'm not incorrect.
> . . . .
> Q [by Petitioner's counsel].  And you would agree, of course, the shifting the burden argument by the prosecutor is one, or can be one of

the most fatal things a prosecutor can do in closing argument, that could lead to a mistrial or potentially a curative instruction, correct?

A.  Correct.

Q.  When you made the objection, which would be on page 335 of the transcript, the Court indicated, quote, "You can't make this argument now.  It's a little late for that."  Then you answered, "I'm putting it, respectfully, Your Honor, I submit that it isn't too late."  And the Court said, "It's not timely, sir.  You have to make an objection simultaneously."  You then renewed it, and the Court overruled it.  In retrospect do you wish you would have made that objection to shifting the burden, as the Court had demonstrated, simultaneously when the prosecutor had made that statement about the defense didn't call a witness, and we've only called one witness?  In retrospect do you wish you should have made that objection simultaneously?

A.  Respectfully, no.  Like I said before, I often will not, if it rises, if something is so incorrect it can rise to the level of fundamental error, and as you stated a moment ago, something that egregious, if it is truly a shifting of the burden, can result in a new trial, anyway, even if there's no objection made, from my recollection of the case law.  I don't regret not making the objection, I made it along with others of what I thought had occurred in the closing argument, at what I felt was an appropriate time, to preserve it.  The Court disagreed.  I don't know if that issue was brought up at the appellate level, or what the conclusion of that was, but I stand by when and how I objected.  It depends on the situation.
. . . .

Q.  Do you recall in closing argument it was argued, essentially bolstering the witness by the State, that the fire marshal quote of "who did he charge," making the implication that you don't charge or try people that are innocent?  Do you remember that statement being made in closing argument?

A.  I don't recall it specifically.  My question would then be was it something that I objected to at that time or later?

Q. Correct, and that is my question. Do you recall not objecting to that statement?

A. Apparently I objected to it, apparently just later when I made my objections. Again, my presumption would be at the appellate level that would have been something that would have been argued was fundamental error.

Q. So if I understand you directly [sic], the basis for you not objecting to both bolstering the witness, and potentially shifting the burden, was because you believed at the appellate level that was something that would rise to fundamental error, and you didn't want to appeal [sic] simultaneously at the time because you thought it might affect the verdict?

A. No. Quite often I will not make an immediate objection to something that may rise to the level of fundamental error if I don't want to call more attention to it to the jury, which can exacerbate egregiousness of the improper argument. If it's that improper, then at the appellate level it should be argued that it's fundamental error, especially if it's cumulative like I would submit may have occurred in this case, but apparently at the appellate level it wasn't found to be so.

Q. I guess just finally, then, you make, you're saying that you make the decision not to draw attention to it, but you recognize the fact at the appellate level you then have to argue fundamental, it's a higher threshold you have to meet on appeal, as opposed to arguing it simultaneously, is that what you're saying?

A. And again, I don't know what was argued on this case at the appellate level. I know what tactically I decide at times regarding my objections during closing or opening, and the manner in which I objected speaks for itself on the record.

(Ex. AA at 581–82, 586–87, 598–99).

The state court adjudicated Petitioner's IATC claim as follows:

In ground 2(d), the Defendant alleges that counsel was ineffective for failing to object to improper closing arguments.  Specifically, the prosecutor made two comments that the Defendant argues were objectionable.  First, the State commented that Tommy Barron was the only expert witness presented in the case.  The Defendant maintains that it is improper for the State to comment on a defendant's failure to mount a defense.  Secondly, the State argued that the fire marshal had properly charged the Defendant with the crime.  The Defendant claims that this improper argument implied that his guilt was predetermined by law enforcement, thus "denigrating the function of the entire trial."  The Defendant asserts that his attorney did not contemporaneously object to these two statements, and when his objection was made later on, the court rejected it as untimely.  The Defendant alleges that he was prejudiced by not receiving a mistrial or at least a limiting instruction on these improper arguments.  In addition, the opportunity for appellate review was foreclosed by the untimely objection.

The Defendant's claim is without merit.  It should be noted that the two comments made by the State were during rebuttal argument.  With respect to the first comment made by the State, the prosecutor stated, "You heard Tommy Barron testify.  Use your own recollection as to his testimony.  His testimony from the stand, he is the expert, he is the only expert that testified in this case." (Tr. at 328.)  The defense did make a late objection to this comment, but it was not considered by the Court because it was untimely. (Tr. at 334–35.)  Mr. Knight testified at the evidentiary hearing that, strategically, he elects not to make an immediate objection in closing argument because it may draw even more attention to the alleged improper statement.  Further, if it is truly improper, Mr. Knight stated that it could have been raised on appeal as a fundamental error.

Assuming arguendo that the comment was improper, counsel had strategic reasons for not immediately objecting and requesting a mistrial or a limiting instruction.  Furthermore, the comment was one made in

isolation and not emphasized throughout the State's closing argument. In context, it was not so egregious or inflammatory as to affect the jury's verdict. Instead, the prosecutor made an isolated remark in the middle of his rebuttal argument that responded to the various criticisms brought out by defense counsel during his closing. (Tr. at 327–330.) He did not emphasize or directly state that the Defendant had failed to come forward with his own expert to refute the State's witness. Had counsel objected, the jury would have been alerted to the statement, which was harmless in passing but may have been damaging if highlighted by an objection from defense counsel. Thus, counsel's decision not to immediately object was tactical and reasonable under those circumstances.

In any case, the Defendant cannot demonstrate that he was prejudiced by the comment to the extent that the outcome of the trial would have been different if counsel had objected. As counsel explained, this could have had the effect of drawing more attention to the comment. *See, e.g., Cole v. State*, 841 So. 2d 409, 417 (Fla. 2003) (counsel was not ineffective for waiting to make an objection and declining a curative instruction so as to avoid emphasizing the offensive comment). Moreover, had counsel objected and moved for a mistrial, it is unlikely that this would have been granted based on this single comment. *See Robards v. State*, 112 So. 3d 1256, 1270 (Fla. 2013) (when granting a mistrial based upon improper comment, "the prosecutor's statements must have been so prejudicial as to vitiate the entire trial."). Because this comment was isolated and not repeated, and the prosecutor did not directly comment on the Defendant's failure to call his own expert, this Court finds that the Defendant has not demonstrated that he was prejudiced to the extent that the jury verdict would have been different. *See Conner v. State*, 910 So. 2d 313 (Fla. 5th DCA 2005).

In the second instance, the prosecutor stated, "at the end of the day after he had talked with Investigator Barron, who did he charge? So apparently he resolved what didn't make sense to the point that where he was prepared to charge the defendant with arson and cruelty to animals." (Tr. at 332.) The Defendant argues that this comment implies that the

State only charges those who are guilty. Taken in context, the prosecutor was responding to the defense's closing, where counsel discussed Officer Daffin's comment that the victim's story regarding the fire and the explosions did not make sense to him. (*See* Tr. at 309–10; 315; 324; 326.) Defense counsel's entire closing argument focused on shifting the blame to the victim and asserting that the investigating officers did not thoroughly investigate the case before charging the Defendant. (Tr. at 307–327.) However, the State points out that this was a fair comment on the evidence at trial regarding Officer Daffin's decision to charge the Defendant, despite the victim's story not making sense to him initially. After making this remark about the victim's story, Investigator Daffin further explained that he was not real knowledgeable about fires. (Tr. at 179–80.) In addition, he explained his role as the case agent and how he made charging decisions, and also clarified that he had spoken to other witnesses prior to making his charging decision. (Tr. at 166–167; 186–87.) Therefore, the prosecutor's comment was not an improper argument regarding the guilt of the Defendant but was instead a response to defense counsel's arguments and also a fair comment on the evidence. *See Bell v. State*, 108 So. 3d 639, 649 (Fla. 2013) (holding that the prosecutor's comment in direct rebuttal to the defense's argument was an "invited response" and therefore not improper); *Smith v. State*, 7 So. 3d 473 (Fla. 2009) (explaining that attorneys are given wide latitude in their arguments, but they must confine their comments to the evidence produce at trial and all logical deductions therefrom). Accordingly, Ground 2 and all its subclaims are denied.

(Ex. Z at 403–05). The First DCA affirmed the decision per curiam without written opinion.

Under Florida law, the standard for reviewing prosecutorial comments is the following:

Wide latitude is permitted in arguing to a jury. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments.

> The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown.  A new trial should be granted when it is "reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done."  Each case must be considered on its own merits, however, and within the circumstances surrounding the complained-of remarks.

Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) (quoting Darden v. State, 329 So. 2d 287, 289 (Fla. 1976)) (other citations omitted).  This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution.  A prosecutor may argue both facts in evidence and reasonable inferences from those facts.  *See* Tucker v. Kemp, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted).  The prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence.  United States v. Johns, 734 F.2d 657, 663 (11th Cir. 1984).  A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury.  *See* White v. State, 377 So. 2d 1149 (Fla. 1980).  Additionally, prosecutorial comment upon a general lack of defense evidence is permissible.  *See* Smiley v. State, 395 So. 2d 235 (Fla. 1st DCA 1981).

Attempts to bolster a witness by vouching for his or her credibility are improper "if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility." United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991) (citing United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983)). A jury could believe that the prosecutor personally believed in the witness' credibility "if the prosecutor either places the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity, or the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony." Id. (citation omitted). Thus, the court must examine whether (1) the prosecutor explicitly personally assured the witness' credibility, or (2) the prosecutor implicitly vouched for the witness' credibility by implying that evidence not presented to the jury supports the witness' testimony. United States v. Castro, 89 F.3d 1443, 1457 (11th Cir. 1996) (citing Sims, 719 F.2d at 377).

However, "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility . . . it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." United States v. Hernandez, 921 F.2d 1569, 1573 (11th Cir. 1991). Furthermore, when the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the

comment is not improper.  United States v. Granville, 716 F.2d 819, 822 (11th Cir.

1983) (finding no prosecutorial misconduct where prosecutor, in effort to support

testimony of two government witnesses, only pointed to matters in evidence: the

demeanor of one witness and testimony of support witnesses, as well as a tape

recording corroborating the testimony of another) (citations omitted).  Likewise, a

prosecutor may reply to remarks, comments or assertions made by defense counsel.

See United States v. Young, 470 U.S. 1, 11–13, 105 S. Ct. 1038, 84 L. Ed.2 d 1 (1985)

(when prosecutor's comments are an "invited reply" in response to defense counsel's

own remarks, and he "[does] no more than respond substantially in order to 'right the

scale,' such comments would not warrant reversing a conviction") (citations omitted).

"[T]he limits of proper argument find their source in notions of fairness, the

same source from which flows the right to due process of law."  Houston v. Estelle,

569 F.2d 372, 380 (5th Cir. 1978).  "The relevant question is whether the prosecutor's

comments 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464,

2471, 91 L. Ed. 2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94

S. Ct. 1868, 40 L. Ed. 2d 431 (1974)).  Thus, to establish prosecutorial misconduct,

a two-prong test must be satisfied:  (1) the prosecutor's comments must have been

improper; and (2) the comments must have rendered the trial fundamentally unfair.

*See* Eyster, 948 F.2d at 1206 (citations omitted); Brooks v. Kemp, 762 F.2d 1383,

1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S. Ct.

3325, 92 L. Ed. 2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987); Dessaure

v. State, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required

only when the error upon which it rests is so prejudicial as to vitiate the entire trial,

making a mistrial necessary to ensure that the defendant receives a fair trial).

With respect to a defense attorney's failure to object to a prosecutor's

comments, "[a]n objectively reasonable trial lawyer could . . . prefer not to make

objections during closing argument unless the objection is a strong one." Holland v.

Florida, 775 F.3d 1294, 1317 (11th Cir. 2014) (internal quotation marks and citation

omitted).

Upon review of the evidence adduced at Petitioner's trial and the entirety of the

arguments of the prosecutor and defense counsel during closing arguments (Ex. D at

293–340), the undersigned concludes it was not unreasonable for the state circuit court

and the First DCA to conclude that Petitioner failed to show (1) that defense counsel's

failure to timely object to the two comments identified by Petitioner constituted

deficient performance, and (2) that there is a reasonable probability the outcome of

trial (or direct appeal, for that matter) would have been different if counsel had timely

objected or moved for a mistrial or both.

    With respect to the prosecutor's first comment (i.e., that Detective Barron "was

the only expert witness presented in this case"), defense counsel argued:

> You heard Detective Barron state, he comes in here at trial and he says, yes, it was from Q-2 to Q-1, going that way. And you heard me ask him, and you heard him testify from this stand that at his deposition on March 17th, 2006, his testimony and his expert opinion was that the fire started from Q-1 where Ms. Baggett was and moved along the floor toward the door.
> . . . .
> And so he also says in his expert opinion that this fire could have been started by a man or a woman in the great room area. There was testimony and no matter what the state tries to tell you when they get back up here, no matter how many times they try to say he said it was started in Point 2 and it went this way, it started in Point 2 and went this way. That's not what the testimony was. There was contradictory testimony from Detective Barron. He had said something at his deposition, again, completely contrary. And then he also says, again, no matter how many times they say it started at Q-2 and went this way. His expert opinion was that it could have started from multiple points in that room from any man or woman. So, keeping that in mind, and from what Mr. Reese told you and compare, Mr. Reese testified in this trial and you should apply the same rules to his testimony that you would to evaluating any other witnesses' testimony. So think about, when you go back to deliberate think about what Mr. Reese said. Think about how he testified, the manner in which he testified.
> . . . .
> It makes more sense, based on the physical evidence in this trial, from Q-1 here, and Detective Barron can get up there all day long and say, oh, well, that's where my, I got my first sample in Q-2, but when, when he talked about where the dog alerted, and there is real question about that

and we're going to talk about that in a minute.  One comes before two, always.  Doesn't it?  Especially in a scientific investigation, in a law enforcement investigation.  What sense does it make to say that, oh, this is where the major concentration was and this is where the first alert was, Q-2 when we have a Q-1 over there.  Okay.  That makes no sense. It makes no sense.

(Ex. D at 311–12).  Defense counsel focused a substantial portion of his closing

argument discrediting Detective Barron's expert investigation and opinion.  Defense

counsel argued that Barron's inadequate documentation of the fire scene, nonsensical

system of collecting evidence, failure to collect and submit certain evidence for

forensic testing, inconsistent statements regarding his conclusions, etc., were "red

flags," and did not make sense compared to Petitioner's description of what occurred

on the night of the fire, which made perfect sense (*id.* at 312–27).

In response, the prosecutor argued:

Now, the defense, Mr. Knight would take one piece of the puzzle and wave it over here.  And not tell you about the other pieces of the puzzle, such as talking about Investigator Barron.  On one hand he wants you to think that Investigator Barron is absolutely accurate, everything he says is right about that throwing the match and dropping back and getting in the fire.  But Investigator Barron doesn't know what he is doing, doesn't now [sic] how to count 1, 2, 3 about the samples.  Well, you can't have it both ways.

You heard Tommy Barron testify.  Use your own recollection as to his testimony.  His testimony from the stand, he is the expert, he is the only expert that testified in this case.  That fire started right there.  Wasn't no discrepancy about that [sic].  And I think it was testified to four or

five times, and it spread back this way. That is consistent with, you saw the evidence, you saw the charred column that he pointed to. So again, use your—there was a lot of argument by the defense about the photographs he took. Investigator Barron told you what he did.

. . . .

He did what he could. And he told you, he said on his drawings. He makes these drawings up and he told you where he found it, as he indicated where he took the samples, Q-1, Q-2, he indicated all of these things. And you can at [sic] the pictures. He was very meticulous about each one of the photographs. So you have evidence of the detail that he put into this. And again, he's the expert and he says there is no question that fire started at the front door and spread to the back.

. . . .

The issue is did the defendant start the fire. That's the only issue in this case.

. . . .

Judge will talk to you about weighing the evidence. It is up to you to decide which evidence is reliable. You should use your common sense. You keep hearing us talk about that, that's why we tell you that, the judge will tell you that in deciding which is the best evidence and which evidence should not be relied upon in considering your verdict. You may find some of the evidence not reliable. You can do that. You can choose to believe or disbelieve anything you want. I would submit to you that the defendant's testimony today is not reliable.

(Ex. D at 327–29, 333–34). Defense counsel objected to this comment as improper

burden-shifting, but the court responded that the objection was not timely (*id.* at

334–35).

Petitioner claims that his trial counsel was ineffective for failing to

<u>contemporaneously</u> object to the prosecutor's comment as improper burden-shifting.

But as the state court noted, the prosecutor did not emphasize or directly state that the

defense had failed to come forward with its own expert to refute the State's expert witness. Further, the comment did not suggest that the defense was required to present evidence or shoulder any burden to either produce an expert or prove that Petitioner did not start the fire. Therefore, the state court reasonably concluded that Petitioner failed to demonstrate that defense counsel's failure to lodge a timely objection was objectively unreasonable. *See* United States v. Paul, 175 F.3d 906, 912 (11th Cir. 1999) (prosecutor's comment that the defense had resources and had the opportunity to produce evidence themselves did not shift burden of proof to the defense; prosecutor told jury that defendant had opportunity to produce handwriting expert to rebut State witness's testimony, not that defendant had any burden to produce rebuttal expert).

Furthermore, defense counsel reminded the jury that the State bore the burden of proof (*id.* at 323, 325–26), and during rebuttal (after the allegedly improper comment), the prosecutor reminded the jury that before they could find Petitioner guilty, the State was required to prove the elements of the crime (Ex. D at 332), thus dispelling any suggestion that Petitioner was required to bear any burden of proof. Therefore, Petitioner failed to show a reasonable probability that the outcome of trial

(or direct appeal, for that matter) would have been different if counsel had made a timely objection to the comment.[14]

With respect to the prosecutor's second comment (i.e., "at the end of the day after he [Daffin] talked with [State Fire Marshal] Investigator Barron, who did he charge?  So apparently he resolved what didn't make sense to the point that where [sic] he was prepared to charge the defendant with arson and cruelty to animals."), the trial transcript reflects that much of defense counsel's cross-examination of Investigator Daffin focused on whether his prior relationship with Suzanne Baggett (i.e., Daffin's former in-law) and his sympathy toward her regarding the death of her

---

[14] The undersigned includes the parenthetical regarding direct appeal, because the Eleventh Circuit has recognized that on rare occasions the prejudice prong of an IATC claim must be analyzed for the prejudicial effect on the outcome of appeal instead of trial.  When the claimed error of counsel is related to the outcome of trial (not the outcome of direct appeal), and the claimed error is counsel's failure to raise a particular issue in the trial court at all (as opposed to bringing the error to the trial court's attention but failing to follow the proper procedure for preserving it for appeal), the court must gauge prejudice against the outcome of the trial, that is, whether there is a reasonable probability of a different result at trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).  When a petitioner claims that although counsel raised an issue of trial court error in the trial court, counsel failed to properly preserve the error for appellate review, a petitioner may demonstrate prejudice by showing there is a reasonable probability of a more favorable outcome on appeal had the claim been preserved.  For example, in Davis v. Sec. for Dep't of Corr., the federal habeas petitioner claimed that although his trial counsel raised a Batson challenge in the trial court (by objecting to the State's possibly discriminatory juror strikes), counsel failed to follow state law procedure for preserving the Batson claim for appeal by either expressly renewing the objection at the conclusion of voir dire or accepting the jury pursuant to a reservation of the Batson challenge.  341 F.3d 1301, 1315–16 (11th Cir. 2003).  The Eleventh Circuit held that when a defendant "raises the unusual claim that trial counsel, while efficacious in raising an issue, nonetheless failed to preserve it for appeal, the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved."  341 F.3d at 1316.

son, affected his decision to charge Petitioner, instead of Ms. Baggett, with arson (Ex. C at 174–75, 179–86). Defense counsel even asked, "So, Investigator Daffin, it is your testimony that despite your prior relationship with Ms. Baggett that didn't affect your judgment about who to charge in this case at all?" (*id.* 185). Daffin responded, "No, sir" (*id.*).

During defense counsel's closing argument, counsel repeatedly asserted that from the beginning of the investigation, "the fingers . . . pointed entirely toward Mr. Reese and away from Ms. Baggett" due to bias and sympathy toward Suzanne Baggett (Ex. D at 308). Defense counsel urged the jury, more than once, to remember during their deliberations that Investigator Daffin admitted that part of Ms. Baggett's description of the fire "didn't make sense," yet Daffin still pointed the finger at Petitioner (*id.* at 308–26). Defense counsel argued that Daffin's personal feelings toward Ms. Baggett affected his judgment as to who he charged with starting the fire (*id.*).

The prosecutor responded:

Use your recollection of the testimony and how the witnesses presented themselves, how the defendant testified here today. They made a lot about Investigator Daffin saying, well, it didn't make sense. Well, it was confusing, it is a confusing kind of interesting [sic] that a man would pour gasoline and ignite it in somebody's home. But I tell you what, at the end of the day after he had talked with [State Fire

Marshal] Investigator Barron, who did he charge?  So apparently he resolved what didn't make sense to the point that where he was prepared to charge the defendant with arson and cruelty to animals.

(Ex. D at 331–32).

Petitioner claims that his trial counsel was ineffective for failing to contemporaneously object to this comment as "def[ying] the state and federal presumption of innocence" and improperly professing the prosecutor's personal belief in Petitioner's guilt.  In context, the prosecutor's comment amounted to nothing more than an assertion, based upon Daffin's testimony and in response to defense counsel's argument, that the State had no improper motives for charging Petitioner instead of Ms. Baggett.  A court could reasonably find no deficient performance, because the remark fell within the "doctrine of fair reply," *see* United States v. Hiett, 581 F.2d 1199, 1204 (5th Cir. 1978).  *See* Holland, 775 F.3d at 1318 (state court could reasonably find no deficient performance and no effect on trial's outcome where defense counsel commented during closing argument that the only reason the defendant was charged with robbery was to create a predicate offense for first-degree murder, and prosecutor responded, "[t]he reason the robbery is in the indictment is because the robbery occurred; he took the gun away by force, violence, and assault.").

Petitioner failed to demonstrate that the state courts' adjudication of Petitioner's IATC claim was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of <u>Strickland</u>. Petitioner's failure to satisfy § 2254(d) precludes federal habeas relief on this claim.

### 6.    "Reese's trial attorney was ineffective for failing to request a special jury instruction regarding spoliation of evidence."

Petitioner alleges Investigator Daffin testified that he purposely destroyed a diagram of the fire scene created by Suzanne Baggett (*see* ECF No. 20 at 47). Petitioner argues this diagram was crucial evidence, because Baggett and Petitioner were the only two people who would know how the fire started (*id.*). Petitioner contends defense counsel should have requested a jury instruction, pursuant to <u>California v. Trombetta</u>, 467 U.S. 479, 488 (1984) and <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988), stating that spoliation of evidence creates a presumption that the destroyed evidence was detrimental to the party who destroyed it (the State), and/or beneficial to the opposing party (Petitioner) (*id.*).

Respondent contends Petitioner did not present this IATC claim to the state courts; therefore, it is unexhausted (*see* ECF No. 32 at 39). Respondent contends Petitioner cannot show cause for his failure to present the issue, considering that he filed three Rule 3.850 motions in state court and failed to present the issue in any of

them (*id.*).  Respondent additionally contends Petitioner cannot show prejudice (*id.* at 39–41).

In Petitioner's reply, he does not dispute Respondent's exhaustion argument (ECF No. 39).

Notwithstanding Petitioner's failure to exhaust this IATC claim, Petitioner failed to show he is entitled to relief.  Trombetta arose out of a drunk-driving prosecution in which the State had introduced test results indicating the concentration of alcohol in the blood of two motorists.  The defendants sought to suppress the test results on the ground that the State had failed to preserve the breath samples used in the test.  The Supreme Court rejected this argument for several reasons:  first, "the officers here were acting in 'good faith and in accord with their normal practice,'" 467 U.S. at 488 (quoting Killian v. United States, 368 U.S. 231, 242, 82 S. Ct. 302, 7 L. Ed. 2d 256 (1961)); second, in the light of the procedures actually used the chances that preserved samples would have exculpated the defendants were slim, 467 U.S. at 489; and, third, even if the samples might have shown inaccuracy in the tests, the defendants had "alternative means of demonstrating their innocence." *Id.* at 490. The Court held that the State's constitutional duty to preserve evidence is limited to evidence that "both possess[es] an exculpatory value that was apparent before the

evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489.

Youngblood arose out of a child sexual assault prosecution in which the State did not test the victim's clothing for biological evidence at the time it was collected, and did not preserve the clothing for future testing. At trial, both a criminologist for the State and a defense expert testified as to what might have been shown by tests performed on the clothing shortly after it was collected, or by later tests performed on the clothing had the clothing been properly preserved. The Supreme Court held that although the Due Process Clause, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose "material exculpatory evidence," the Due Process Clause "requires a different result" when the State fails to preserve evidentiary material which is "potentially useful." 488 U.S. at 57–58. "Potentially useful" evidence is evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* When the State fails to preserve potentially useful evidence, due process is violated only if the defendant can show bad faith on the part of the police or prosecution. *Id.* at 58; *see also* Dufour v. State, 905 So. 2d 42, 68 (Fla. 2005). "Under Youngblood, bad faith exists only when police intentionally destroy evidence

they believe would exonerate a defendant." <u>Dufour</u>, 905 So. 2d at 68 (internal

quotation marks and citation omitted).

Here, Petitioner alleges Investigator Daffin destroyed a diagram created by Ms.

Baggett of the fire scene (*see* ECF No. 20 at 47). Investigator Daffin testified at trial

that he took a statement from Ms. Baggett approximately three hours after the fire (Ex.

C at 170). On cross-examination, defense counsel questioned Daffin about Ms.

Baggett's description of where the fire started and where she was at the time it started:

> Q. Let me ask you about the statement you took from Ms. Baggett
> on September 19th at the scene. She told you that she had been inside
> the home and that the fire had started at the front of the home near the
> front door?
>
> A. Yes, sir.
>
> Q. And that then there was an explosion toward the garage area?
>
> A. Yes, sir.
>
> Q. And that she was in between that same area?
>
> A. Yes, sir.

(Ex. C at 179). Defense counsel then inquired about the diagram/map:

> Q. And when Ms. Baggett, you were interviewing her that night,
> she drew you a map about where she was at?
>
> A. Yes, sir.

Q. And you destroyed that map?

A. Yes, sir.

(*see* Ex. C at 180).

Petitioner failed to show that there was anything about Ms. Baggett's diagram/map that gave it apparent exculpatory value. Furthermore, Petitioner was able to obtain comparable evidence by other reasonably available means. In Investigator Daffin's affidavit of probable cause supporting the warrant for Petitioner's arrest, Daffin provided Ms. Baggett's statement (*see* Ex. A at 1–4). According to Daffin's affidavit, Ms. Baggett described her and Petitioner's respective locations in the house when the fire started (*id.* at 2). She stated that Petitioner was just inside the front door when he lit the match, and Baggett was forty feet away at the other end of the hallway (*id.*). At most, Ms. Baggett's diagram/map was "potentially useful."

Because the evidentiary material was only "potentially useful," <u>Youngblood</u>'s bad-faith requirement applies. Petitioner makes a conclusory assertion that Investigator Daffin "purposely" destroyed the diagram/map, but his assertion is factually unsupported. Daffin's admission that he destroyed the diagram/map does not suggest that his conduct was intentional, as opposed to negligent. Furthermore,

Petitioner alleges no facts which suggest Daffin believed that the diagram/map exonerated Petitioner. Therefore, Petitioner failed to satisfy the <u>Youngblood</u> standard.

Petitioner failed to show that defense counsel had a meritorious basis for requesting a special jury instruction regarding the State's destruction of evidence, or that there is a reasonable probability the trial court would have properly granted the request. *See, e.g.*, <u>Patterson v. State</u>, 199 So. 3d 253 (Fla. 2016) (holding that there was no due process violation under <u>Youngblood</u> in vehicle arson case, even though vehicle was destroyed after State experts physically examined it but before defense expert had opportunity to do so, where vehicle was extensively photographed prior to its destruction and defense expert reviewed those photographs, and there was no evidence that vehicle was destroyed in bad faith); <u>Crockett v. State</u>, 206 So. 3d 742, 751 (Fla. 1st DCA 2016) (affirming trial court's conclusion that the State's negligent destruction of physical evidence from the case—the sheet used to tie up the victims, the stolen jewelry and gun, and the photographic line-up from which five eye-witnesses identified defendant promptly after the crimes occurred—was unfortunate, but not the result of bad faith and therefore not a due process violation or a factor to be weighed against the State; the State retained photographs of the jewelry, the gun, and the photo arrays; defendant made no showing that the sheets

would contain any DNA evidence at all, nor that it was likely any such evidence would be exculpatory rather than merely potentially useful; and witnesses had identified the stolen jewelry and the stolen gun as theirs). Therefore, Petitioner failed to satisfy the <u>Strickland</u> standard with respect to this IATC claim.

C.    <u>"The Cumulative Effect of the Errors Denied Reese a Fair Trial."</u>

Petitioner argues that all of the above-described errors have the cumulative effect of denying his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial (ECF No. 20 at 48).

Respondent contends Petitioner's claim is without merit (ECF No. 32 at 41).

Cumulative effect analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* <u>Morris v. Sec'y, Dep't of Corr.</u>, 677 F.3d 1117, 1132 (11th Cir. 2012) (cumulative error claim fails in light of the absence of any individual errors to accumulate); <u>United States v. Waldon</u>, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist).

Here, Petitioner has not shown error of a constitutional dimension with respect to any of the constitutional errors alleged in his § 2254 petition. Therefore, he is not entitled to federal habeas relief on this "cumulative effect" claim.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  Buck v. Davis, 580 U.S.—, 137 S. Ct. 773 (2017) (citing Miller-El, 537 U.S. at 327).  Here, Petitioner cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the Second Amended Petition (ECF No. 20) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>19</u><sup>th</sup> day of June 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**